Linda M. Tirelli, Esq.
Garvey, Tirelli & Cushner Ltd.
*Attorneys for the Debtor*
50 Main Street, Suite 390
White Plains, New York 10606
(914) 946-2200 / (914) 946-1300
LindaTirelli@thegtcfirm.com

Bruce Jacobs, Esq.
Jacobs Keeley, PLLC
*Attorneys for the Debtor*
169 East Flagler Street, Suite 1620
Miami, FL 33131
(305) 358-7991
jacobs@jakelegal.com

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK
## WHITE PLAINS DIVISION

-----------------------------------------------------------------X

In re

HELEN RACANELLI

                **CHAPTER 13**
                **CASE NO. 16-22617 (RDD)**

      Debtor

-----------------------------------------------------------------X

HELEN RACANELLI

      Plaintiff

                **ADV. PRO. NO._____(rdd)**

      -against-

Bank of America, N.A., AND
Nationstar Mortgage LLC, AND
U.S. Bank National Association, as Trustee for
GSAA Home Equity Trust 06-00019, Asset-Backed
Certificates, Series 06-00019 AND Recontrust

      Defendants

-----------------------------------------------------------------X

## <u>COMPLAINT</u>

**COMPLAINT FOR A DECLARATORY JUDGMENT AND ORDER HOLDING
DEFENDANTS  IN BREACH OF CONTRACT, CONTEMPT
OF COURT, VIOLATION OF THE AUTOMATIC STAY UNDER 11 U.S.C. § 362(a),
VIOLATION OF FEDERAL RULE OF BANKRUPTCY PROCEDURE 3002.1,
VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT PURSUANT TO
15 U.S.C. §1692, OBJECTION TO PROOF OF CLAIM FILED BY BANK OF
AMERICA, N.A., OBJECTION TO MOTION FOR RELIEF FROM STAY,
DECLARATORY JUDGMENT VOIDING A LIEN PURSUANT TO 11 U.S.C. § 506,
FRAUD,
VOIDNESS OF DEBT DUE TO TENDER WAIVER,
AND AWARDING TO THE DEBTOR ACTUAL DAMAGES, ATTORNEYS FEES,
COSTS, DISBURSEMENTS AND PUNITIVE DAMAGES PURSUANT TO
<u>11 U.S.C. §§ 105(a), 362(k) AND 1322(b)(5) AND 28 U.S.C. §§ 1334 AND 157</u>**

Helen Racanelli, the Plaintiff (the "Plaintiff" or the "Debtor") by her attorney Linda M. Tirelli, Esq. of the law firm of Garvey, Tirelli & Cushner, Ltd., respectfully allege as follows:

## JURISDICTION

1.      This is an adversary proceeding brought pursuant to 11 U.S.C. §§ 105, 362(k), 506(a) and (d) and 1322(b)(5) AND 28 U.S.C. §§ 1334 AND 157.

2.      Jurisdiction over the subject matter of this adversary proceeding is conferred upon the Court by 28 U.S.C. § 1344.

3.      This adversary proceeding is a "core" proceeding within the meaning of 28 U.S.C. § 157(b)(2)(F)(I).

## PARTIES

4.      Defendant Bank of America, NA is a national bank with its headquarters located at 100 North Tryon Street, Charlotte, NC   28202.  Defendant may be served with process of this court upon Brian Moynihan, CEO or upon any officer or authorized agent.  BOA was the servicer of this loan at the time the surrogate signed endorsements and fictitious mortgage assignments were prepared to improve the record in anticipation of this litigation.  Individually, this defendant will be referred to as "BOA" and the misconduct alleged by BOA was done as servicer on behalf of U.S. Bank as Trustee of the securitized trust in this action.

5.      Defendant Nationstar Mortgage LLC, is a mortgage servicer with its primary headquarters located in the State of Texas at 8950 Cypress Waters Boulevard, Coppell, TX 75019. Defendant may be served with process of this court upon Mr. Jay Bray, President and CEO or upon any officer or authorized agent.  Individually this defendant will be referred to as "Nationstar".  Nationstar is believed to be an agent acting on behalf of Defendant U.S. Bank National Association, as Trustee for GSAA Home Equity Trust 06-00019, Asset-Backed Certificates, Series 06-00019.

6.      Defendant, U.S. Bank National Association is a national bank with its primary headquarters located in the State of Ohio at 425 Walnut Street Cincinnati, OH 45202-3923. Individually U.S. Bank National Association will be referred to as "U.S. Bank".  U.S. Bank is believed to be acting as a trustee for a securitized trust known as GSAA Home Equity Trust 06-00019, Asset-Backed Certificates, Series 06-00019.Asset-Backed Certificates, Series 06-00019. Defendant may be served with process of this court upon Mr. Richard K. Davis, President and CEO of U.S. Bank, NA or upon any officer or authorized agent.  The trust for which Defendant U.S. Bank acts as trustee claims to be the owner and holder of a certain note and mortgage.

7.      Defendant, Recontrust Company, N.A., ("Recontrust"), is a wholly owned subsidiary of BOA with its primary headquarters at 1800 Tapo Canyon Road, Simi Valley, CA 93063.  Defendant may be served with process of this court upon any officer or authorized agent. Recontrust was the document custodian for this loan at the time the surrogate signed endorsements and fictitious mortgage assignments were prepared to improve the record in anticipation of this litigation.  Recontrust's Senior Vice President, Marie Garner, gave false testimony in an effort to cover up the fraud upon the court by the surrogate signed endorsements on the note in this case.

## FACTS

A.  The Procedural History of This Action

8.      On May 3, 2016, (the "Filing Date") the Debtor, Ms. Helen Racanelli (the "Debtor") filed a petition for relief under Chapter 13 of Title 11 U.S.C. §101 et seq. with this Court and an Order for relief was entered.

9.      On or about July 17, 2016, the chapter 13 trustee conducted the Debtor's 341(a) Meeting of the Creditors at the United States Bankruptcy Court, Southern District of New York, White Plains, NY.

10.     On May 4, 2016, the Debtor filed a chapter 13 plan of reorganization.  (See ECF No. 5).

11.     The Debtor owns and continue to own a secondary property located at 18 Mountainview Avenue, Ardsley, NY 10502 (the "Property").

12.     Prior to the date of the Debtor's bankruptcy filing, on or about, the Debtor executed a promissory note (the "Note") evidencing a loan obtained for the purchase of the Property in the original principle amount of $508,000.00 in favor of Countrywide Bank, NA ("Countrywide") and a mortgage (the "Mortgage") executed to Mortgage Electronic Registration Systems, Inc. ("MERS"), acting solely as a nominee for Countrywide securing payment of the Note.

13.     On or about October 30, 2008, the Debtor and her husband, a non-debtor, attempted to secure a modification of their loan with Countrywide Home Loans.  The Debtor, following written instructions of Countrywide Home Loans, an entity the Debtor perceived to be a servicer, tendered a check in the amount of FOUR THOUSAND SEVEN HUNDRED FORTY-THREE AND 65/100 ($4743.65) to Countrywide Home Loans.

14.     In a letter dated November 11, 2008 from Countrywide Home Loans addressed to the Debtor, Helen Racanelli, Countrywide Home Loans refused the check returning the same to the Debtor, uncashed, and thereby waived the tender and all right to seek any further payment. A copy of the letter waiving tender is attached hereto as **Exhibit "A".**

15.     On or about June 29, 2016 Nationstar filed a 2 page Objection to the confirmation of the Debtor's plan with no supporting documents.  Said objection appears as document number 12 on the Court's ECF System.

16.     On or about August 29, 2016, Nationstar prepared and filed a Motion for Relief From Stay without the benefit of first filing a proof of claim.  The Motion for Relief From Stay alleged post-petition arrears but fails to acknowledge that the Debtor's Plan included a cram-down with 100% payment of the secured portion of the debt, if any.

17.    The Court should note that the Debtor's plan includes monthly payments to the Trustee in the amount of EIGHT-THOUSAND TWO HUNDRED FIFTY AND 00/100 ($8250.00).  The Debtor listed the appraised value of the property as $400,000.00.

18.    For the reasons set forth herein below, the Debtor now believes the claimant is attempting to "better its record" by creating "after the fact evidence" to prove it is the holder of her note and mortgage in an ongoing fraud upon the court.  Specifically, the claimant is relying on surrogate signed endorsements and fictitious, void mortgage assignments created by BOA and its agents in anticipation of litigation as part of an ongoing fraud upon the courts which violates the $25 Billion National Mortgage Settlement.

19.    On or about August 30, 2016, Nationstar prepared and filed a proof of claim in the Debtor's chapter 13 case, Claim No. 3-1 based upon the alleged Debtor's the Note and Mortgage underlying the Property.  (See this Court's Claims Register).

20.    In its proof of claim, Nationstar identified the "creditor" as U.S. Bank National Association, as Trustee for GSAA Home Equity Trust 2006-19, Asset-Backed Certificates, Series 2006-19 and further identified itself as the entity to contact for purposes of payments and notices in the bankruptcy case.

21.    The proof of claim 3-1 is signed with an obvious electronic / digital signature block which whites out much of the line designated for signature as well as the line below it.  The name in the signature block is that of Jennelle C. Arnod of the law firm Aldridge Pite, LLP. It is unknown at this time what authority Ms Arnod had to sign the proof of claimant what documents were actually verified and authenticated by her.

22.    In support of its Proof of Claim, Nationstar, the (alleged) agent to U.S. Bank, NA, attached the following to the proof of claim:

a. Untitled spreadsheets bearing none of the Debtor's identifying information (ie., no name, no address, no account number, no social security number, no birthdate, no mailing address, etc);

b. A curious "Standing Notice" identifying Nationstar as a servicer and further claiming that U.S. Bank National Association, as Trustee for GSAA Home Equity Trust 2006-19, Asset-Backed Certificates, Series 2006-19 as the "noteholder". This statements reads in part,  *"Noteholder directly or through an agent, has possession of the promissory note.  The promissory note is either made payable to Noteholder or has been duly endorsed. Noteholder is the original mortgagee, or beneficiary, or the assignee of the security instrument for the referenced loan."*

c. A 1-page Letterhead of Aldridge Pite LLP with a "Proof of Claim Disclosures" appearing thereon;

d. A 5-page Annual Escrow Account Disclosure Statement of unknown origin from an unknown source. It is unsigned;

e. A printed image of a 5-page "Interest Only Adjustable Rate Note" bearing a double-rubber stamp "indorsement" bearing rubber stamp signatures of Laurie Meder and Michelle Sjolander.

f. A recording page from the Westachester County Land Records and 13-page mortgage document;

g. A 5-page document " Fixed/Adjustable Rate Rider";

h. A Westchester County Recording and Endorsement Page which notes the instrument should be recorded and returned to "Pillar Processing LLC" the back-door bogus document manufacturing operation of the disgraced Steven J Baum law firm together with a 1 page "Assignment of Mortgage" dated **August 12, 2009** signed by "Elpinicki M. Bechakas" as an officer of MERS.

i.    A 1-page Westchester County Recording Sheet again noting the document should be recorded and returned to "Pillar Processing LLC" the back-door bogus document manufacturing operation of the disgraced Steven J Baum law firm.  It is unknown why this page is included in this proof of claim.

j.    A 1-page Westchester County Recording and Endorsement Page together with a 1 page "Assignment of Mortgage" indicating a document was recorded on December 31, 2013 noting the document should be recorded and returned to Gross Polowy Orlans LLC, a foreclosure mill firm formed by and still largely comprised of the lawyers and staff who once worked at the now disgraced Steven J Baum law firm and/or Pillar Processing LLC along with a 2-page "Corporate Assignment of Mortgage with the typewritten ( in a different font" "corrective Assignment" across the top.  Said Corporate Assignment of Mortgage purports to assign the Debtor's mortgage from MERS as Nominee of Countrywide Bank, NA to US Bank National Association as Trustee for the Holders of the GSAA HomeEquity Trust 2006-19, Asset Backed Certificates, Series 2006-19".  Said assignment is dated December 12, 2013 and signed by "Susan Lindhorst as Assistant Secretary of MERS as Nominee for Countrywide Bank, NA".

**B. The False MERS Assignment and Surrogate Signed Endorsements Presented as Evidence of Standing in this Adversary Proceeding**

23.    The court should know that Susan Lindhorst is a robo-signer employed by Nationstar Mortgage and has signed numerous documents appearing courts throughout this country as an officer of Nationstar Mortgage.

24.    This 2013 assignment alleges to be correcting a scriveners error of the prior 2009 assignment.  There is no indication as to the authority of Ms. Lindhorst to sign on behalf of a nominee for a bank which collapsed 4 years prior.

25.     Nor is there any indication as to the authority Ms. Lindhorst had to make any corrections to the 2009 bogus assignment manufactured by the Steven J Baum law firm through its back-door operation known as Pillar Processing.

26.     The Court should further know that according to the FDIC public website, Countrywide Bank NA became an inactive institution on **April 27, 2009**.  MERS could not have acted as a nominee for Countrywide Bank, FSB, an inactive institution, on August 9, 2009.

27.     Defendants also attached a copy of the original note with a dual blank endorsement bearing the rubber-stamped signature of Michelle Sjolander and Laurie Meder ("the endorsements") to the proof of claim.

28.     BOA, as servicer for U.S. Bank, caused agents and/or employees to affix the endorsements to the back of the original note as part of a "90 day delinquent note endorsement process" involving systemic surrogate signing for notes more than 90 days delinquent.

29.     BOA's agents and/or employees affixed the endorsements by rubber stamp in anticipation of filing the foreclosure, years after origination and years after the closing date of the trust in an effort to perpetrate a fraud upon the court.

30.     As discussed *supra,* BOA, its agents, and its corporate representative prepared false evidence and testified falsely to defraud federal bankruptcy courts and state court judges into believing the endorsements were affixed within days of origination by document custodian employees authorized to use Ms. Sjolander's or Ms. Meder's rubber signature stamp.

31.     After the robo-signing scandal, BOA decided to save the hundreds of thousands of cases filed throughout the federal bankruptcy courts and state foreclosure courts with lost note counts and unendorsed notes by implementing a new fraud upon the court.

32.     Rather than dismiss those cases, pay attorney's fees and new filing fees to refile the cases after endorsing the original notes, BOA engaged in fraud upon the court setting up a cover story that the surrogate signed endorsements of Michelle Sjolander, David Spector, Laurie Meder

and Christina Schmidt were affixed within days of origination by document custodian employees acting under proper authorizations.

33.     JP Morgan Chase and Wells Fargo also engaged in substantially similar schemes to defraud federal bankruptcy courts and state courts by affixing rubber stamped endorsements onto unendorsed notes years into the foreclosure litigation and preparing fictitious assignments.

D.     The Testimony of Linda DeMartini Who Admits in Federal Court That No Countrywide Notes Were Endorsed as of 2009

34.     BOA is the successor by merger to BAC Home Loan Servicing, LP.

35.     Linda DeMartini, a supervisor and operational team leader for the Litigation Management Department for BAC Home Loans Servicing L.P. ("BAC Servicing"), testified at trial before the Honorable Federal District Judge Judith H. Wizmur, Chief Bankruptcy Judge for the District of New Jersey in the case of *Kemp v. Countrywide Home Loans, Inc.,* (440 B.R. 624, 628-629 (D. N.J. Bkrtcy (2010)).

36.     In *Kemp*, Judge Wizmur found "an allonge purporting to negotiate the note to the Bank of New York was not executed until shortly before the original trial date, and was not affixed to the original note until the second trial date." Id. 631

37.     Judge Wizmur noted that that the new allonge was prepared in anticipation of this litigation, and that it was signed several weeks before the trial by Sharon Mason. *Id.* at 628.

38.     According to page 15 of Ms. DeMartini's trial testimony transcript (attached as Exhibit B) she stated in August of 2009:

> Q     Now, you were asked about whether or not the note could be -- was endorsed at the bottom. **Is it generally the practice to endorse the actual note or to use an allonge?**
>
> **A     It's -- I've never seen an actual note that has an endorsement on the bottom.**
>
> Q.    So would you say it's normal –
>
> A.    It's generally more --

Q.        -- to have an allonge?

A.        Yeah, it would be more normal to have an allonge.

39.    At pages 16 and 17 of the Kemp trial transcript, Ms. DeMartini testified:

Q.        So between 2006 and 2009 when you got a phone call from counsel that said we've got a problem, prepare an allonge, there was no allonge, correct?

A.        There wasn't an allonge prior to that, no. This loan, like I said, it was always -- this was a loan that we originated that has always been within the company that yes, it was sold to -- as Bank of New York as the trustee and securitized, but there wasn't a need for an allonge prior to this case.

Q         Because there was no litigation pending, correct?

A         Well, because there was no litigation -

40.    At pages 19 through 21, Judge Wizmur personally questioned Ms. DeMartini to

clarify her testimony and found:

Q         So the question is whether you know whether it's normal practice for Countrywide to execute an allonge at the time that that transfer takes place.

A         I don't believe that they're always executed exactly when the transfer takes place. I believe that it often times happens that it happens after the fact.

Q         And does it always happen?

A.        I can speak that it always happens, no.

Q         So there's no routine that requires internally, to your knowledge, that the allonge be executed in connection with the transfer of ownership?

A         No, I don't think that there is a norm in that respect because in a normal course of action and for -- and normal is kind of a hard word anyway -- but –

Q         A normal business practice, an ordinary –

A         -- but as a normal business practice with a normal loan, often times there really isn't a need for it unless the loan is going to continually to be sold, and since this loan was -- yes, it was transferred to Bank

of New York as trustee as it was securitized, but it wasn't that another mortgage company had the loan and then we bought it from them. Like I mentioned, this was always done by Countrywide and we securitized it and we -- you know, we sold it to them –

Q      This was done --

A      --and so--

Q      -- I'm not asking whether it was necessary, I am asking whether there was an ordinary business practice to sign an allonge and the answer is no, there was not?

A      I don't believe so.

41.      Finally, Ms. DeMartini later noted at page 48, ln 2-5 that as of 2009:

"It never used to be to where the originals were ever requested but lately more and more of the time of day of things around the country, we are being asked to physically produce the originals more frequently."

42.      As Ms. DeMartini testified truthfully when she stated original notes from Countrywide loans originated between 2006 and 2009 were never endorsed.

43.      It was the practice in 2009 to create allonges just before trial as a normal practice.

44.      Ms. DeMartini's testimony that no notes were endorsed before they were needed for trial is consistent with the fact that thousands of foreclosures were filed without endorsements on original notes.

E.      <u>The Fraud on the Court Was Cheaper and Easier than Admitting the Notes were not Negotiable Instruments, and that the 2001 Amendments to Article 9 of the UCC Codified the Common Law Rule that the Mortgage Follows the Note</u>

45.      BOA, JP Morgan Chase, and Wells Fargo all engaged in fraudulent practices to establish their standing to foreclose to avoid the heightened proof requirements under Article 9 of the UCC.

46.      In 2001, New York State adopted the Uniform Commission on Laws Recommendations to Amend Article 9 of the Uniform Commercial Code to include the sale of

promissory notes in the law governing secured transactions and to codify the common law rule that the mortgage follows the note.

47.     These 2001 amendments codified that, upon proof of purchase of the debt evidenced by the signed agreements from the closing of the securitized trust documenting a complete chain of title for each loan, the mortgages would follow the note for all the loans in the securitized transaction, without need for further evidence.

48.     In 2006, in response to allegations of widespread improprieties made at a Fannie Mae shareholders meeting, the international law firm of Baker Hostetler issued a report to Fannie Mae to address the allegations ("the BH Report").  On February 4, 2012, the New York Times published this report online.  http://www.nytimes.com/interactive/2012/02/05/business/05fannie-doc.html?action=click&contentCollection=Business%20Day&module=RelatedCoverage&pgtype=article&region=EndOfArticle&_r=0   See Request for Judicial Notice Tab A.

49.     The 2006 BH Report to Fannie Mae concluded at page 35 "that foreclosure attorneys in Florida are routinely filing false pleadings and affidavits regarding the Plaintiff's – MERS or servicers – interest in the proceedings and regarding lost, missing or destroyed promissory notes.  The practice could be occurring elsewhere3.  It is axiomatic that the practice is improper and should be stopped."

50.     The BH Report to Fannie Mae also included a section at page 37 entitled "Effects of a Note Endorsed in Blank" which contained the banking industry's official legal position from 2006, that Article 9 of the Uniform Commercial Code ("UCC"), entitled secured transactions, controls the sale of promissory notes subject to a mortgage.

51.     Fannie Mae is an industry leader who sets the national standard for issuing and foreclosing on mortgage loans, usually documented using Fannie Mae uniform instruments.

52.     The BH Report discussed an interview with Fannie Mae's then Deputy General Counsel, Daniel C. Smith, who explained:

"**Fannie Mae's position is that it does not need to appear in the land records in order to have the benefit of the security provided by the mortgage.** UCC§ 9-203(g) and its accompanying comment state that the transfer of an obligation secured by a security interest also transfers the security interest. Thus, the transfer of the promissory note, which is the obligation, also transfers the mortgage, which is the security interest. **Once the note is sold to Fannie Mae, the mortgage also transfers, despite the fact that the servicer, lender or MERS' name appears in the land records.**"

53.    Of key importance to the banking industry was that they would be able to increase their profits from the securitization of mortgage loans by avoiding the costs and expense of recording assignments of mortgages in the public records and paying documentary stamps to local governments, which would drastically reduce their profits.

54.    The BH Report agrees with the interpretation that Article 9 of the UCC codified the common law rule that the "mortgage follows the note" upon proof of purchase of the debt.

55.    Before the BH Report was issued, the State of New York, State of Florida, and almost all other states within the United States of America revised their statutory codifications of the UCC in 2001 to expand Article 9 to include the sale of promissory notes.

56.    The newly revised N.Y. U.C.C. Law § 9-109 (McKinney) and the mirroring Florida Statute § 679.2031 codified the common law rule that the mortgage follows the note.  The statutes further provided that, unless the party seeking to enforce the mortgage and mortgage note was the loan originator, any party seeking to enforce a mortgage and note must present evidence that the foreclosing party owned the note (i.e. paid value to a party who had the right to enforce and transfer the mortgage note), and that party is in possession of the original note.

57.    This analysis is a question of first impression whether the 2001 Amendments to Article 9 of the UCC created a "Statute of Frauds" for mortgage assignments requiring proof of the contractual chain of title.

58.    The security interest only followed the sale of the promissory note if there was evidence of a complete chain of title and chain of custody for all transfers from the originator to the party seeking to enforce the security instrument.

59.    Also after the 2001 amendments to Article 9, the State of Florida revised Florida Statute §702.01 with express language stating an assignment of a mortgage is now a secured transaction under Article 9, allowing the banking industry to avoid the cost and expense of recording mortgage assignments in the public records.

60.    Moreover, Official Comment Number 7 to Florida Statute §679.1091 which mirrors N.Y. U.C.C. Law § 9-109 (McKinney) expressly provided that any attempt to obtain or perfect a security interest in a mortgage loan by non-Article 9 law, such as by recording an assignment of mortgage without more, would be wholly ineffective.

61.    Despite the clear changes to New York and Florida law confirmed by the BH report, the Defendants BOA and Nationstar, on their own and/or as agents of Defendant US Bank N.A., as Trustee, continue to misrepresent to this court and courts throughout this nation that Article 3 of the UCC controls and that the effect of a note endorsed in blank as alleged here provides them with sufficient evidence of standing without regard to Article 9.

62.    The Defendants and their agents further misrepresent to courts around the nation that every mortgage note on a residential home, which are far from uniform, are negotiable instruments despite the fact that the promissory notes provide that additional amounts due under the note are provided for in the mortgage and additional protections the mortgage associated with the mortgage note, thereby destroying the negotiability of the mortgage notes under the UCC.

63.    The Note here is an interest only adjustable rate note with a 10 year interest only period and is based on a one-year LIBOR Index as published in the Wall Street Journal, a news publication outside of the Note and mortgage documents.  Moreover, ¶4(B) of the note provides the note holder may choose a different index based upon comparable information if the original

index is no longer available.  The reader must refer to the outside source in order to determine the value of the instrument.

64.     The Debtor avers that the Note is a non-negotiable instrument as the parties contracted out of the UCC definition of "Holder" in ¶1 of the promissory note which states: "… Lender or anyone who takes by transfer and who is entitled to receive payments under this Note is called the "Note Holder."  Therefore, a party in possession of the original note with a blank endorsement would still need to prove it took by lawful transfer and had entitlement to receive payments.  Article 3 of the UCC says even a thief can enforce a blank endorsed note.  This note does not permit such a result.

65.     The Debtor further avers that the Note is a non-negotiable instrument pursuant to ¶6 of the promissory note which provides any loan charge later found to be illegal may, at lender's option, result in a reduction in principal.  Accordingly, the reader must refer to the outside source in order to determine the value of the instrument.

66.     The Debtor further avers that the Note is a non-negotiable instrument pursuant to ¶11 of the promissory note which provides there are additional protections for the Note Holder in the mortgage if the borrower fails to keep its promises.  Accordingly, the note is governed by and subject to the various provisions of the mortgage that affect the amounts due under that note.

67.     Specifically, the mortgage defines the term "loan" at §(G) as all amounts due under the note and mortgage.  The mortgage further provides at page 6, ¶2, the application of payments goes first to interest, then principal, then *amounts due under ¶3 of the mortgage*, then late charges, then any other charges under the mortgage, then to reduce the principal.  This renders the note subject to the mortgage and affects the amount due under the note.

68.     The Debtor further avers that the Note is a non-negotiable instrument pursuant to page 5, ¶5 of the promissory note which provides the lender may force place insurance and page

7 ¶9 which provides any amounts lender pays to protect the property all become additional debt secured by the mortgage that accrues interest at the note rate.

69.      Moreover, at pages 6 and 8, the mortgage provides the lender may use any "insurance proceeds" or "miscellaneous proceeds" to reduce the amount due under the note.  This also renders the note subject to the mortgage and affects the amount due under the note, all and any of which destroy the notes negotiability.

70.      Even if the note were a negotiable instrument, the "mortgage follows the note" doctrine has been codified by Article 9 of the NYS Uniform Commercial Code.  The exclusive statutory means to prove purchase of the debt is by N.Y. U.C.C. Law § 9-203(b) (McKinney).  Only then does the mortgage follows the note under N.Y. U.C.C. Law § 9-203(g).

71.      Essentially, the 2001 amendments to Article 9 of the NYS Uniform Commercial Code codified the process by which sales of promissory notes were documented through mortgage loan purchase agreements, pooling and servicing agreements, and the Trustee's certifications of the final mortgage loan schedules.

72.      These chain of title documents were provided to the Trustee at closing of the trust and unequivocally establish ownership and were statutorily made the exclusive way to prove the right to foreclose, irrespective of whether the note was a negotiable instrument or not.

E.      The Robo-Signing Scandal and the Various Settlements that Followed

73.      The Court should know that the robo-signing scandal involved hundreds of thousands of MERS assignments of mortgage ("AOM") representing false transactions.  The practice was discovered because the handwritten signatures of certain MERS officers varied greatly.  Each MERS signing officer had a room full of people signing their names.  It was cheaper and easier to fabricate robo-signed AOMs than to comply with Article 9 of the UCC.

74.      Before the foreclosure crisis, Lender Processing Services ("LPS"), now known as Black Knight Financial, contracted with BOA (and others) to use its Mortgage Servicing Platform

("MSP") software and agreed to provide default servicing for all of BOA's mortgage loans, including paying for all foreclosure related costs and attorney's fees.

75.     To handle this contractual obligation, LPS established a network of law firms to prosecute foreclosures of MSP serviced mortgages, including the now disgraced and defunct Steven J. Baum law firm in New York, and the disgraced and defunct law offices of David J. Stern and Marshall C. Watson in Florida.

76.     In 2010, an extensive investigation by Assistant Attorney Generals June M. Clarkson, Theresa B. Edwards and Rene D. Harrod, on behalf of the Office of then Florida Attorney General, Bill McCullom, Economic Crimes Division, resulted in a power point presentation entitled Unfair, Deceptive and Unconscionable Acts in Foreclosure Cases.   See Request for Judicial Notice Tab B.

77.     The Florida Attorney General presentation specifically described the "bogus" documents used in the unfair, deceptive and unconscionable practices and explained:

a.      mortgage foreclosure complaints filed without standing as evidenced by mortgage assignments executed and recorded months after the lis pendens;

b.      mortgage assignments were "not executed by the authorized person;"

c.      unauthorized signors used pens to make the signatures of authorized signors on mortgage assignments;

d.      unauthorized signors used rubber-stamps to make the signatures of authorized signors on mortgage assignments;

e.      mortgage assignments were executed on behalf of bankrupt companies; and/or

f.      mortgage assignments were executed on behalf of defunct companies;

78.     In a press release regarding the presentation, the Attorney General described how LPS and its wholly owned subsidiary, DocX:

"produced numerous documents, called Assignments of Mortgage, that to even the untrained eye, appear to be forged and/or fabricated ... [then] used to gain standing for the plaintiff in a foreclosure suit. Subject corporations seem to be creating and

manufacturing "bogus assignments" of mortgage in order that foreclosures may go through more quickly and efficiently. These documents appear to be forged, incorrectly and illegally executed, false and misleading. These documents are used in court cases as "real" documents of assignment and presented to the court as so, when it actually appears that they are fabricated in order to meet the demands of the institution that does not, in fact, have the necessary documentation to foreclose according to law. See Request for Judicial Notice Tab C. (emphasis added).

### i.   The $120 Million Florida Surrogate Signing Settlement with LPS

79.     On January 31, 2013, Florida Attorney General Pam Bondi ("AG Bondi") announced a $120 million Multi-State Settlement with Lender Processing Services and its subsidiary DocX, LLC ("DocX").  See Request for Judicial Notice Tab D.

80.     The settlement expressly prohibited "the practice of surrogate signing of documents...." The settlement described surrogate signing as "the signing of documents by an unauthorized person in the name of another... as if they had been signed by the proper person...."

81.     Ultimately, the Florida Attorney General settled with DocX and LPS by a Consent Final Judgment prohibiting inter alia, surrogate signing.  See Request for Judicial Notice Tab E.

82.     In Section 2.3 of the resulting Consent Final Judgment, DocX stipulated its management directed employees to sign Mortgage Loan Documents in the name of other DocX employees, who were or had been at one time authorized to sign on behalf of Servicers. DocX referred to these unauthorized signers as "Surrogate Signers."

83.     These surrogate signors "were not authorized by the applicable Servicer to sign their own names or the names of those persons who had purportedly been authorized by the Servicer to sign the Mortgage Loan Documents in question...."

84.     "The Surrogate Signers executed certain Mortgage Loan Documents in the name of other DocX employees without indicating that the documents had been signed by a Surrogate Signer."

### ii.   The $25 Billion National Mortgage Settlement

85.    Many other government agencies investigated the "robo-signing" scandal. The Office of Inspector General found in 2012, BOA encouraged and financially rewarded to "robosign" affidavits and other documents needed to process foreclosures.

86.    The widespread misuse of MERS eventually resulted in state and federal investigations resolved by (1) a "Consent Order" between MERS and four federal agencies in 2011 and (2) a "Consent Judgment'" between the five largest mortgage service companies and the U.S. Department of Justice, other federal agencies and the Attorneys General of 49 states.

87.    As part of the settlement of allegations that it had knowingly committed numerous abuses in the servicing and foreclosing of residential mortgages, BOA agreed to pay $8.5 Billion ($7.6 Billion of which was designated for homeowners), and to abide by a comprehensive list of conditions set forth in Exhibit A, attached and expressly incorporated into the Consent Judgment. See Mitchell v. Wells Fargo Bank, N.A., CV 13-04017-KAW, 2014 U.S. Dist. LEXIS 7803, at *10 (N.D. Cal. Jan. 21, 2014) (taking judicial notice of the Consent Judgment).

88.    The requirements of Exhibit A to the National Mortgage Settlement were designed to both prohibit past abuses and to provide a mechanism for consumers to obtain meaningful relief for BoA's fraudulent foreclosure practices. Among other things, Exhibit A required BoA to ensure that factual assertions made in all foreclosure-related documents and filings be "accurate and complete and ...supported by competent and reliable evidence."

89.    BOA presumably ended the practice of using surrogate signed evidence to establish standing in foreclosure cases. It even agreed to notify the borrower or borrower's counsel and substitute documents with proper signatures. BOA, 2012 U.S. Dist. LEXIS 188892, at **24-30, 52-54, and 67-70.

F.    MERS Is Still Being Used as an Instrumentality of Fraud

90.    Fannie Mae's Deputy General Counsel stated in the 2006 Baker Hostetler report that Article 9 makes assignments irrelevant, so it didn't matter whether MERS appeared in the land records because the mortgage follows the note upon proof of purchase of the debt.

91.    MERS purports only to be a registry that acts as nominee for the originator and never owns any interest in mortgage loan.  In fact, the website for the MERS Certifying Officers Test provides a sample test question answer which states:

## Answer

- True or **False**: MERS assignments should also reference a transfer of the corresponding promissory note (e.g., ". . . together with Note or other evidence of indebtedness . . .")



92.    Despite the clear prohibition that MERS assignments should not also transfer the note, Defendants continue to rely on such improper, incompetent evidence to establish standing.

93.    On December 29, 2014, the Osceola County Clerk of the Circuit Court issued a report which found at page 23 that "the 'MERS® System' Facilitates Abuse of False and Misrepresentative Recordations in Real Property Records, including the Real Property Records of Osceola County, Florida" after an extensive examination of MERS assignments.  See Request for Judicial Notice Osceola County Clerk Forensic Examination, ("the Forensic Examination") http://www.osceolaclerk.com/Content/UploadedContent/Examination/OC_Forensic_Examination.pdf.

94.    The Summary of the Overview at page 25 of the Forensic Examination states,

"Since the Clerk elected to make public the fact that he intended to conduct a forensic examination of the official real property and court records that he was elected as a public trustee to maintain, he has informed the examination team that **he has come under political pressure from out- side law firms and former judges, who appear to be scrutinizing his right to examine the integrity of the land records he was elected to be the custodian of**. (emphasis added).

95.    The Osceola Clerk of Court ultimately concluded probable cause existed to bring a RICO prosecution related to MERS mortgage assignments routinely recorded in public land records before filing foreclosure to buttress insufficient evidence of standing to foreclose.

96.    United States Congressman Alan Grayson of the 9th District of Florida issued a letter to the United States Attorney General, Loretta E. Lynch calling for the prosecution of anyone engaged in the fraud and white collar criminal activity covered by the forensic investigation. See Request for Judicial Notice Tab F.

97.    The Forensic Examination repeatedly refers "known robosignor" and/or "known BOA robosignor" and/or "known BOA N.A., employee" at pages 211, 240, 245, 250, and 251 of volume 1 and pages 65, 70, 183, 202, and 321 of volume 2.

98.    The Forensic Examination also repeatedly refers "known BOA robo-notary" who's "name and notary seal has been commonly seen on many BOA-related document manufactures" at page 241 of volume 1 and pages 65, 70, 86 and 298 of volume 2.

99.    The Forensic Examination focuses on examples of assignments prepared by lawyers and law firm who filed foreclosures and Void AOMs purporting to establish standing on behalf of BOA and Bank of New York Mellon in various cases defended by Debtor's Florida counsel.

100.    Debtor's Florida counsel documented a pattern of fraud upon the court in foreclosures filed by Michelle Garcia-Gilbert, formerly of Kass Shuler, who now works for the Gilbert Garcia Group, PA. The Forensic Examination notes:

**This document was prepared by Michelle Garcia Gilbert (FBN549452) in an attempt to assign a note and mortgage from MERS as a standalone nominee (using its Flint, Michigan post office box address) as Assignor to a closed SAMI II 2006-AR6 REMIC trust.** There were no witness signatures on the document. **The signor, Mark Bishop, is believed to have been an employee for Countrywide Home Loans, Inc. in Collin County, Texas (taken over by Bank of America, N.A. in 2009).** Countrywide was still in business in 2008 and could have drafted this assignment itself; however, **the drafting of the assignment was for the purposes of foreclosure commencement and so it appears to have been prepared and signed under the direction of the attorney, whether the signor had any knowledge of the actual facts or not. It is also interesting to note that MERS cannot transfer the Note as it did not have an interest in the Note, yet in this assignment, the Note was also transferred.** It is also further interesting to note that a second assignment of mortgage (CFN#2013187561) was electronically filed on 12-02-2013 by Orion Financial Group, Inc.

This CORRECTIVE Assignment of Mortgage is alleged to only correct the name of the purported Assignee, yet there is no mention of the Note being assigned, only the Mortgage. So if the Corrective Assignment of Mortgage is to be believed, ***then the first Assignment of Mortgage was faulty and misrepresentative of the facts, designed to be used to deprive Bounlath Phouasalith of his property, in violation of Florida Criminal Code Section 817.535.*** The documents relating to this Exhibit are also attached for reference.

101.    From page 187 through page 191, the Forensic examination focuses on examples

of assignments prepared and recorded by Kass Shuler finding:

**The 2008 Assignment of Mortgage also appears to utilize MERS as a standalone (with no nominee present; but obviously under the direction of Michelle Garcia Gilbert, a Tampa attorney, who prepared the document for signing. It was signed by Mark Bishop, who claims to be a 1st Vice President of MERS (even though no such titles were ever delegated), representing itself (by seal) as a standalone party in interest, paralleling its successor assignment.** Both assignments were signed in Texas (the first allegedly by Bank of America employees in Collin County, Texas; the second by a third-party document manufacturer in Tarrant County, Texas). **Both assignments appear to assign the mortgage from MERS directly to a trust.** Unless a person examined the original mortgage (noted only as "Book 3232, Page 950"; no CFN listed) would they be able to figure out that the original lender was the now-subsumed Countrywide Home Loans, Inc. **The information in both of these assignments however does not mention Countrywide Home Loans, Inc. but rather claims MERS is the "Assignor" without naming them in "nominee status". Both of these assignments appear misrepresentative of the real party in interest, as MERS cannot transfer something it does not have an interest in.**

**Similarly, no matter how you state the name of the 2006-AR6 trust, the closing date of this entity was August 4, 2006, as shown in the information contained in the following link: http://www.secinfo.com/dRQ1j.vf8.htm; thus, the**

**REMIC could not (in either instance) have accepted the mortgage and note into the trust in violation of the PSA, SEC and IRS regulations. Despite the lack of any filing of foreclosure litigation against the property, the documents themselves contain false and misrepresentative information, in apparent violation of Florida Criminal Code § 817.535....**

**The chain of Assignments thus were utilized to misrepresent the true owner of the Note in an attempt to foreclose on the property in violation of Florida Criminal Code Section 817.535 and Florida RICO statutes. Kass Shuler also appears culpable.**

F.    BOA's Fraud Upon the Court Began in 2008 and Still Continues

102.    By its own admission, if BOA's corporate representative had told the truth about how the endorsements on the note at issue herein were affixed, the testimony is that unauthorized signors affixed the signatures of Ms. Sjolander and Ms. Meder without their present intention to adopt those signatures, which constitutes surrogate signing.

103.    This Honorable Court should take judicial notice of the court filings in Bank of New York v. SSG Worldwide, LLC before the Honorable Miami-Dade Circuit Court Judge William Thomas under Court Case Number 08-59791-CA 20.

104.    The discovery in the SSG Worldwide case is relevant to establish the fraudulent nature of the endorsements affixed to the note in this case and the use of false assignments in this case.  The evidence is all prepared by BOA in these related cases.

105.    The evidence in Bank of New York v. SSG Worldwide, LLC shows that on September 24, 2008, BOA sent the original note to its initial foreclosure counsel, Kass Shuler.

106.    On October 3, 2008, Kass Shuler had an attorney, Michelle Garcia Gilbert, file a complaint alleging a lost note count and attaching an unendorsed copy of the original note.  See Request for Judicial Notice of the SSG Worldwide Motion for Sanctions Under the Court's Inherent Contempt Powers at Tab G.

107.    At the time of filing the complaint with a lost note count, BOA records reflected that Kass Shuler had the original note in its possession.

108.    On October 24, 2008, Kass Shuler had the same lawyer, Michelle Garcia Gilbert, record the same form AOM as in other cases, that had an effective date backdated to September 12, 2008, also just weeks the date of the foreclosure filing.

109.    This first AOM and the AOM in the other BOA cases represented a transaction between MERS and the named Plaintiff that never actually occurred according to the testimony of all the witnesses with knowledge of the actual transaction by which the named Plaintiff claims to have acquired these loans.

110.    On February 16, 2010, Plaintiff's law firm then had the same lawyer, Michelle Garcia Gilbert, prepare, record and present as evidence a second AOM with a backdated effective date to September 12, 2008, just before the date of the foreclosure filing.

111.    Again, that second AOM used the exact same form as the first AOM and the AOM in the other cases which all represented a transaction between MERS and the Bank of New York that never actually occurred according to the testimony of witnesses produced for deposition with knowledge of the transaction.

112.    On May 10, 2012, Plaintiff's servicer, BOA, prepared and recorded a third assignment of mortgage which claimed MERS sold Defendant's note and mortgage for a third time to Plaintiff on May 7, 2012.

113.    BOA's business records then reflect the original note left the Kass Shuler law firm in 2012 and went to "Sourcecorp" for an "IFR Indorsement Review" on June 1, 2012.

114.    The following day, June 2, 2012, BOA's business records showed it "received the indorsed original note."

115.    At the SSG Worldwide trial, BOA introduced a "servicing history" screenshot into evidence.  This screenshot shows that BOA had direct involvement in preparing the first and second assignments of mortgages with a backdated effective date of September 12, 2008, prepared by the same lawyer from the same law firm.

116.     Both assignments went to BOA to be signed by a BOA employee for MERS.

117.     The Servicing History screenshot further reveals the only significance of September 12, 2008, is that BOA assigned the foreclosure action to the law firm that prepared the backdated assignments on that date.

118.     The effective date of September 12, 2008 has no other legal significance related to any sale or purchase of the subject note and mortgage.

119.     There is no record of these transactions in the MERS life of loan history report.

     *i.*   *The First Summary Judgment in SSG World Wide That Relied on the Second Materially False Assignment of Mortgage Recorded After, But Backdated to Before, the Filing of this Foreclosure Action*

120.     In June of 2010, BOA, as servicer for Bank of New York Mellon filed a Notice of filing the second materially false AOM recorded in February of 2010, in support of its first Motion for Summary Judgment in the SSG case.  The Motion for summary judgment did not rely on an endorsed note as evidence.

121.     Plaintiff relied exclusively on the backdated effective date in the second AOM to establish its standing to foreclose for the first Summary Judgment Motion.  However, Plaintiff never went to a hearing on that motion.

     *ii.*   *Business Records Present Strong Evidence That Someone Endorsed the Original Note Years After Filing the SSG Worldwide Foreclosure*

122.     BOA prepared and recorded a third assignment of mortgage for the SSG Worldwide case in May of 2012, which again claimed that MERS sold the mortgage to the Plaintiff "together with the note" despite the prior assignments.

123.     BOA's records then reflect that a few weeks later, on June 1, 2012, four years into the foreclosure action, BOA conducted an "IFR Indorsement Review" on the original note which had been sent from the law firm to Sourcecorp, a document management company servicing "high volume, mission critical" clients in the financial industry.

124.   The next day, on June 2, 2012, BOA's business records contained an entry stating it received the "indorsed original note" for the first time.

      iii.     *BOA Stonewalled Discovery into This IFR Indorsement Review in Violation of a Court Order, the Rules of Discovery, and the Rules of Professional Conduct*

125.   Debtor's counsel sought discovery to establish that, on June 1, 2012, someone affixed the signature of Michelle Sjolander using a rubber stamp to endorse the original note in a manner that conflicts with BOA's corporate representative's official statement that all notes were endorsed within days of origination by authorized document custodian employees.

126.   On January 11, 2016, Plaintiff's trial witness, Sandra Prestia, appeared at her first deposition and gave materially false testimony that Sourcecorp was merely a location owned by BOA where notes were scanned.

127.   On January 19, 2016, Ms. Prestia appeared at her second deposition as corporate representative with most knowledge about, inter alia, Sourcecorp and the IFR Indorsement Review, and how the endorsements and assignments were created for this case.

128.   Ms. Prestia admitted Sourcecorp is a third party acting under an agreement to provide services to BOA's agents.  She admitted her false information about Sourcecorp testified to at the first deposition was based entirely on hearsay from a woman named "Stephanie" who worked at the collateral department.

129.   However, Ms. Prestia then gave materially false information claiming that Plaintiff had no way to collect the information required for a corporate representative deposition of areas of inquiries related to Sourcecorp and the IFR Indorsement Review.

130.   Ms. Prestia simply failed to make a good faith effort to collect that information, failing to even contact the collateral department that made the record entries referring to Sourcecorp and the IFR Indorsement Review.  Ms. Prestia made the materially false statement that she had no access to contact information for the collateral department of her company.

131.    Accordingly, Ms. Prestia could not even state whether Sourcecorp or another party conducted the IFR Indorsement Review or explain what occurred in an IFR Indorsement Review process, despite being the BOA employee produced as the corporate representative with most knowledge on the issue.

132.    Ms. Prestia did concede the records reflect the original note was in the possession of Plaintiff's foreclosure counsel since 2008, and that counsel had scanners.  It would therefore be unnecessary and considerably easier to send a scan of the endorsed original note instead of sending the actual original note to be checked to see if it was endorsed.

iv.    *The Second Summary Judgment Against SSG Worldwide that Attached the Recently Endorsed Original Note As If the Note Had Been Endorsed Before the Foreclosure Was File In the Same Manner As it Presented the Backdated Assignments of Mortgage In the First Summary Judgment Motion.*

133.    Six months after the IFR Indorsement Review entry, on December 27, 2012, BOA as Servicer for Bank of New York Mellon filed a Notice of Voluntary Dismissal of Count II seeking to Re-establish the lost note against SSG Worldwide.

134.    On February 11, 2013, Bank of New York filed its Amended Motion for Summary Judgment with an affidavit that attached a copy of the original note which now had a rubber-stamped blank endorsement purportedly signed by Michelle Sjolander as authorized signor for Countrywide Home Loans.

135.    This was the first time the endorsed note was ever presented in the SSG Worldwide foreclosure.

v.    *The Third Motion for Summary Judgment Against SSG Worldwide Relied on Two Admittedly Materially False Affidavits.*

136.    On April 6, 2015, a third Motion for Summary Judgment against SSG Worldwide included affidavits of Olivia Miller and Susan Maggadino.

137.    Pursuant to court order, Debtor's counsel paid for travel expenses for both affiants to appear for deposition in Miami.

138.    During her deposition, Ms. Miller admitted that her affidavit contained false and materially misleading information in support of the summary judgment motion.

139.    The affidavit in support falsely claimed the affiant had personal knowledge of the prior servicers practices in making records.  In deposition, the affiant admitted she had no such knowledge.  She did not even know how many prior servicers were involved since origination.

140.    BONY further submitted a loan payment history to support the numbers in the affidavit of BONY's claim for summary judgment.  In deposition, the affiant admitted the numbers in her affidavit were not from the loan payment history at all.

141.    Moreover, the numbers in the affidavit claimed computed interest at a fixed rate of 6.5%, which was significantly higher than the adjustable rate note's interest rate resulting in a further inflated final judgment amount.

142.    Ms. Miller admitted the MERS assignments representing a backdated effective date were materially false as no transaction occurred on September 12, 2008.

143.    Ms. Miller began to cry during her deposition.

144.    Thereafter, BOA as Servicer for Bank of New York canceled Ms. Maggadino's deposition and canceled the hearing on their Third Summary Judgment Motion.

145.    Debtor's counsel never had the opportunity to depose Ms. Maggadino about her affidavit in support of its third summary judgment Motion that relied upon the first AOM Ms. Gilbert Garcia recorded after filing the complaint and backdated to September 12, 2008.

146.    According to the testimony of Ms. Sjolander and Ms. Garner, only Ms. Meder and Ms. Sjolander were authorized signors legally allowed to endorse original notes.

147.    Plaintiff's corporate representative conceded in a sworn videotaped deposition that both Ms. Meder and Ms. Sjolander lacked any present intention to adopt the signatures on the original note at the time they were made.

148.    Teams of unauthorized signors used rubber stamps to affix Ms. Sjolander and Ms. Meder's signatures outside their presence and control.

149.    These teams were not the same people identified in the authorization agreements produced in discovery to explain the use of rubber stamps to affix the signatures of Ms. Sjolander and Ms. Meder onto endorsements on original notes.

150.    Ms. Garner and Ms. Sjolander both testified falsely under oath that these rubber stamped signatures were affixed to the original note within days of origination in March of 2009.

151.    BOA engaged in a systemic practice using rubber stamps to surrogate sign endorsements onto original notes years after origination.

152.    BOA engaged Sourcecorp to scan original notes after going through a "90 Day Delinquent Note Endorsement Process" where the surrogate signing occurred.

153.    This systemic surrogate signing practice first began with notes already in foreclosure with a complaint that alleged a lost note count.

154.    In those cases, BOA's counsel was in possession of the unendorsed original note before filing the lost note count and attached to that complaint a copy of the original note in their possession which had no endorsement. Years later, Plaintiff surreptitiously surrogate signed undated endorsements onto original notes.

155.    The sworn video-taped deposition testimony of Ms. Sjolander and Plaintiff's Corporate Representative, Marie Garner, that these endorsements were "surrogate signed" by document custodian employees using a rubber stamps outside the signor's presence within days of origination is false.

156.    The truth about how and when the subject note was endorsed herein is set forth in the "90 Day Delinquent Note Indorsement Process" from the 2011 Statement of Work flowcharts produced under threat of sanctions by SourceHOV.

157.    The flowchart shows that BOA corrected the lack of endorsements on original notes in open, active foreclosures by using unauthorized workers to surrogate sign endorsements on original notes with rubber stamps.

158.    Later, BOA continued the surrogate signing practice for loans about to be referred to foreclosure.

C.  *The Conflicting Testimony of BOA's Senior Vice President Michelle Sjolander*

159.    Both Ms. Sjolander and Ms. Garner gave truthful testimony that no surrogate signing of endorsements onto original notes was done in the presence of an authorized signor.

160.    No authorized signor had a present intention to adopt their signature at the time their signature was stamped.

161.    The balance of Ms. Sjolander and Ms. Garner's testimony as to how the note endorsement process worked for BOA is conflicting, incomplete, and not credible.

162.    Ms. Sjolander testified under oath that all countrywide originated notes were systematically scanned by the document custodian Recontrust, formerly Treasury Bank, then given to teams of surrogate signors who used rubber stamps, including dual stamps, to endorse original notes within days of origination, just before the loans were sold to either Fannie Mae, Freddie Mac, Ginnie Mae or a private label trust.

163.    Ms. Sjolander also testified that in 2002, the only rubber endorsement stamp signatures used belonged to her former boss, David Spector, until he left Countrywide in 2006. Thereafter, Mr. Spector's stamps were collected and removed from circulation in 2006.

164.    Ms. Sjolander also testified that in 2006, the teams of surrogate signors began using rubber stamps with her signature to endorse countrywide originated notes within days of origination.  This practice allegedly continued until the "initiative to scan original notes" began in 2011.  Thereafter, authorized signors use their own signature stamps to endorse original notes.

iv.     _The Conflicting Testimony of the BOA and BONY Corporate Representative,
Recontrust's Senior Vice President Marie Garner_

165.     Two years and nine months after Ms. Sjolander's deposition, on November 24, 2014, Ms. Garner testified as the corporate representative of both BOA and Bank of New York in a sworn videotaped deposition.

166.     Ms. Garner contradicted Ms. Sjolander's testimony by emphatically stating original notes were never scanned upon receipt.

167.     Ms. Sjolander's testimony that she physically walked through the Recontrust facilities and observed original notes being scanned is false.

168.     Ms. Garner initially agreed with Ms. Sjolander's testimony that only Mr. Spector's stamps were in circulation until 2006.  Then, after being confronted with an "authorized user's agreement" for Ms. Sjolander's stamps from 2002, Ms. Garner admitted both the stamps of both Mr. Spector and Ms. Sjolander were in circulation at the same time.

169.     Ms. Garner testified that Recontrust, formerly Treasury Bank, employed teams of document custodian employees who used a collection of rubber stamps to affix the signatures of the authorized signors.  This practice often involved "dual stamps" with more than one authorized signors signature.

170.     Ms. Garner testified that Michelle Sjolander, and the other authorized signors were not present while their stamps were being used.  She further testified the authorized signors lacked any present intention to adopt their signatures when one of three teams of document custodian employees affixed it to original notes using the rubber stamps.

171.     Ms. Garner admitted these surrogate signing practices continued through 2011, even though she testified that in 2010, Freddie Mac issued guidelines expressly prohibiting the practice of having document custodian employees endorse original notes on behalf of any other party under any legal theory.  See attached as Exhibit G.

172.    Ms. Garner admitted that Fannie Mae issued a similar guideline rejecting the use of document custodians to endorse original notes soon thereafter.

### III.    THE FRAUD UPON THE COURT BOA SENTIENTLY SET IN MOTION AFTER THE ROBO-SIGNING SCANDAL AS SET FORTH IN THREE BONY CASES FILED BY KASS SHULER IN 2008

*i.    Other Cases Prosecuted by BOA Further Show Ms. Garner and Ms. Sjolander Gave Perjured Testimony in Claiming That All Original Notes Were Endorsed Within Days Of Origination*

173.    Plaintiff and its counsel produced evidence in <u>BONY v. Bruce and Michelle Jacobs</u> under Miami-Dade Case Number 12-20712 CA 31 establishing that an endorsement by Mr. Spector was surrogate signed onto an allonge in 2011, five years after he left Countrywide.

174.    Moreover, Plaintiff and its counsel produced evidence in <u>BONY v. Barry Alberts</u> under Miami-Dade Case Number 2012-040965-CA-01 that established the rubber endorsement stamps were issued to dozens of departments besides the endorsement rooms.  See Notice of Filing Stamp Issuance Forms.

175.    So many departments had need for rubber stamps bearing Ms. Sjolander's endorsement because the notes were never endorsed within days of origination.  They were endorsed on an as needed basis by those various departments.

176.    BONY and BOA continued their systemic fraud upon the court after the Robo-Signing scandal.

177.    Plaintiff and their counsel made material misrepresentations of fact and law to this Honorable Court and many other circuit court judges, stonewalled discovery, withheld evidence, and had two senior vice presidents commit perjury to cover up this fraud on the court.

178.    This misconduct continued during negotiations with the Executive Branches of the State of Florida and the Federal Government for the $120 Million Florida Attorney General's Surrogate Signing Settlement and the $25 Billion National Mortgage Settlement.

ii.     *The Use of False and Fraudulent Evidence in the BONY v. SSG Donny Marin
Foreclosure Defended by Debtor's Counsel*

179.     This Honorable Court should take judicial notice of the court filings in <u>Bank of
New York v. Donny Marin</u> under Miami Circuit Court Case Number 08-67540.

180.     They show this same Plaintiff's law firm, Kass Shuler, had the same lawyer,
Michelle Garcia Gilbert, file the identical complaint alleging a lost note count and attaching an
unendorsed copy of the note with a stamp "original" on the top of the document.

181.     Kass Shuler had the same lawyer, Michelle Garcia Gilbert, prepare, record and
present as evidence an assignment of mortgage with a backdated effective date to weeks before
filing the Marin foreclosure, that represented a transaction between MERS and the Bank of New
York which never actually occurred.

182.     In the Marin case, BOA, as servicer for Bank of New York later produced an
undated rubber-stamped blank endorsement with the signature of David Spector on the original
note.  Plaintiff offered no evidence to establish when the endorsement was added or by whom.

183.     Plaintiff obtained a final judgment, which is now on appeal, based solely on the
assignment of mortgage with the backdated effective date.

184.     The effective date on the assignment of the Marin mortgage is merely the date BOA
instructed Kass Shuler to file the Marin foreclosure.

d.     *The Nearly Successful Use of False and Fraudulent Evidence in the BONY v.
Richard Von Houtman Prosecuted by Plaintiff's Counsel*

185.     This Honorable Court should take judicial notice of the court filings in <u>Bank of
New York v. Richard Von Houtman</u> under Broward Circuit Court Case Number 08-31733 CACE
02.  They show this same law firm, Kass Shuler, had the same lawyer, Michelle Garcia Gilbert,
file the identical complaint alleging a lost note count and attaching an unendorsed copy of the note.

186.     Kass Shuler had the same lawyer, Michelle Garcia Gilbert, prepare, record and
present as evidence an assignment of mortgage with a backdated effective date to weeks before

filing the *Von Houtman* foreclosure, that represented a transaction between MERS and the Bank of New York which never actually occurred. The date relates only to when BOA instructed Kass Shuler to file the foreclosure action.

187.    As in the *Marin* and *Malo* cases, BOA, as Servicer for Bank of New York, later produced the original *Von Houtman* note that had an undated, rubber-stamped, blank endorsement signature on the original note without any evidence to establish when the endorsement was added or by whom.

188.    BOA as Servicer for Bank of New York obtained a final summary judgment in the *Von Houtman* case based on the undated endorsement added to the original note and the assignment of mortgage backdated to the date Plaintiff assigned the case to Kass Shuler, which was later vacated due to bad service.

e.    *The Attempted Use of False and Fraudulent Evidence in the BONY v. Bruce and Michelle Jacobs Foreclosure Defended by Debtor's Counsel*

189.    This Honorable Court should take judicial notice of the court filings in <u>Bank of New York v. Bruce Jacobs</u> under Miami Circuit Court Case Number 12-20712 CA 31.

190.    Plaintiff filed its foreclosure action with an allonge attached to the complaint with an undated, rubber-stamped signature of David Spector.

191.    BOA prepared, recorded and produced as evidence of standing in discovery, the same assignment of mortgage as the form used in the third assignment found in SSG Worldwide foreclosure action.

192.    The Assignment of Mortgage showed MERS sold Mr. Jacobs' mortgage and note to the Bank of New York on August 26, 2011.  MERS claims to have acted as the nominee for First Magnus Financial Corporation.

193.    At the time, First Magnus Financial Corporation had gone into bankruptcy in 2007 and terminated all executor contracts which would include any agreement for MERS to act as nominee or transfer the note and mortgage to anyone.

194.    BOA, as Servicer for Bank of New York, also produced screenshots that established the allonge attached to the original Jacobs complaint was not in Plaintiff's possession until August of 2011.

195.    Plaintiff's corporate representative testified under oath that any stamps with Mr. Spector's signature were taken out of use after he left his employment in 2006.

196.    The BOA Records showed the allonge was first obtained five years after David Spector left his employment.

197.    From this evidence it is reasonable to infer Plaintiff's counsel systemically filed the same lost note count complaint, unendorsed copy of the original note, and backdated mortgage assignment as a regular business practice.

198.    Thereafter, Plaintiff systemically filed complaints after preparing surrogate signed, rubber stamped endorsements and false mortgage assignments reflecting transactions which never occurred.

199.    In the wake of the robo-signing scandal involving the nearly identical, false AOM presented herein, the Fourth District Court of Appeal of Florida certified a question of great public importance to the Florida Supreme Court because "many, many mortgage foreclosures appear tainted with suspect documents…[which] may dramatically affect the mortgage foreclosure crisis in State." *Pino v. Bank of New York, Mellon*, 57 So. 3d 950, 954 (Fla. 4th DCA 2011).  In his dissent, Judge Pollack wrote:

> **"Decision-making in our courts depends on genuine, reliable evidence. The system cannot tolerate even an attempted use of fraudulent documents and false evidence in our courts. The judicial branch long ago recognized its responsibility to deal with, and punish, the attempted use of false and fraudulent evidence. When such an attempt has been colorably raised by a**

**party, courts must be most vigilant to address the issue and pursue it to a resolution."** Id. at 954 (emphasis added).

200.    On November 25, 2014, Maria Garner, SVP of ReconTrust and Counter-Defendant's corporate representative with most knowledge of the endorsement rooms testified that Document Custodian employees affixed signatures of Michelle Sjolander, David Spector and/or Laurie Meder to original notes using rubber stamps on behalf of various corporate entities.

201.    The Corporate Representative testified that Document Custodian employees affixed these authorized signatures outside the presence of Michelle Sjolander and without their present intention to adopt those signatures.

202.    The Corporate Representative testified that Document Custodian employees affixed these authorized signatures outside the presence of David Spector and without their present intention to adopt those signatures.

203.    The Corporate Representative testified that Document Custodian employees affixed these authorized signatures outside the presence of Laurie Meder and without their present intention to adopt those signatures.

204.    The Corporate Representative testified that Document Custodian employees affixed these authorized signatures outside the presence of Christina Schmidt and without their present intention to adopt those signatures.

205.    The Corporate Representative testified that Counter-Defendant and its co-conspirators established endorsement rooms at document custodial facilities operated by ReconTrust at BoA facilities.

206.    The Corporate Representative testified that the endorsement rooms at each of the three (3) document custodial facilities had teams of up to thirty ReconTrust employees using rubber stamps with the signatures of Michelle Sjolander, David Spector, and Laurie Meder to endorse original notes.

207.    The Corporate Representative testified that Michelle Sjolander was specifically authorized to endorse original notes on behalf of various corporate entities.

208.    The Corporate Representative testified that David Spector was specifically authorized to endorse original notes on behalf of various corporate entities.

209.    The Corporate Representative testified that Laurie Meder was specifically authorized to endorse original notes on behalf of various corporate entities.

210.    The Corporate Representative testified that The document custodian employees were unauthorized signors told to use rubber stamps and "dual stamps" to affix signatures of authorized signors outside their presence and without their present intention to adopt the signatures on the original note being endorsed.

211.    The Corporate Representative testified that all the Countrywide originated original notes were indorsed within days of origination by document custodian employees.

212.    In truth, BOA caused the endorsements to be affixed to original notes years after origination and then had the notes scanned by Sourcecorp, a high volume mission critical document management company that services the financial industry.

213.    These surrogate signed endorsements affixed to original notes <u>after</u> the Black Knight network of law firms filed the foreclosure action on MSP serviced mortgages without attaching copies of any endorsed notes.

214.    These BOA employees, agents and unauthorized signors used rubber stamps to affix the signatures of authorized signors to endorse original notes on MSP serviced mortgages <u>before</u> the Black Knight network of law firms filed the foreclosure action.

215.    These BOA employees, agents and unauthorized signors caused unauthorized signors to use rubber stamps to affix signatures of David Spector on endorsements to original notes after he resigned in 2006.

216.    These BOA employees, agents and unauthorized signors continued to affix the signatures of authorized signors using rubber stamps to endorse original notes through 2011.

217.    As early as January of 2010, the Freddie Mac Guidebook expressly stated document custodian employees cannot "act as Attorney-in-Fact, Agent or Delegatee or pursuant to a power-of-attorney to endorse Notes for the Seller."

218.    BOA presented the surrogate signed endorsed notes as if the evidence of standing existed before filing the complaint, even on cases where the unauthorized signors affixed the endorsement after the filing of the complaint.

219.    Ms. Garner later admitted that rubber stamps with the signatures of both Ms. Sjolander and Mr. Spector were in circulation in the endorsement room facilities since 2002.the new Yorker my

220.    Ms. Garner later admitted that authorization agreements showed the rubber stamps with the signatures of both Ms. Sjolander and Mr. Spector were authorized for use in the endorsement room facilities since 2002.

221.    Ms. Garner admitted that exception reports reflected original notes were missing endorsements even after going through the endorsement rooms.

222.    The 90 Day Delinquent Note Endorsement Process flowcharts produced by SourceHOV under threat of sanctions shows notes were not endorsed at origination.

223.    Upon information and belief, BOA has perjured itself as to when the endorsements were affixed to original notes.

224.    The evidence produced that purports to transfer any interest therein to Plaintiff, is false.  It was created by or at the request of Plaintiff for the express purpose of committing a fraud upon the court.

225.    The evidence is legally ineffective to support Plaintiff's standing to bring this lawsuit.  The evidence constitutes a fraud upon the court, unclean hands, and should bar Plaintiff from the equitable relief of foreclosure.

### COUNT I
### CIVIL CONSPIRACY TO COMMIT FRAUD
### AGAINST COUNTER-PLAINTIFF AND THIS HONORABLE COURT

Plaintiff adopts and reavers the allegations from paragraphs 1-225 as though fully set forth herein.

226.    As set forth, *infra.,* Defendants have conspired with others and taken action to attempt the lawful act of foreclosure by unlawful means.

227.    Defendants intended to defraud both Plaintiff and this Court by using surrogate signed evidence of standing and materially false mortgage assignments.

228.    Defendants, BOA, its successor Nationstar, conspired with Defendant ReconTrust as agents for Defendant US Bank, NA, to interfere with the judicial system's ability impartially to adjudicate this matter by unfairly hampering the presentation of the evidence of standing.

229.    Debtor has suffered damages in an amount to be determined including but not to limited to emotional distress, and the attorney's fees and costs incurred to defend her constitutionally protected property rights and the integrity of this Honorable Court.

### COUNT II
### VIOLATIONS OF RICO

230.    Plaintiff adopts and reavers the allegations from the paragraphs 1-229 as though fully set forth herein.

231.    BOA, Recontrust and Nationstar comprise an "enterprise" or "enterprises" as defined in 18 USC §1961(4).

232.    The enterprise or enterprises have an existence apart from and beyond the racketeering activity complained of in this action.

233.    BOA, Recontrust and Nationstar have violated the provisions 18 USC §1962(c) by conducting or participating, directly or indirectly, in the conduct of the affairs of an enterprise or enterprises, through a pattern of racketeering activity, as set forth in ¶¶ 1-224 herein.

234.    The conduct of BOA, Recontrust and Nationstar constitutes a pattern of racketeering activity that has continued and escalated for more than 8 years, and continues through the present day.

235.    The conduct of BOA, Recontrust and Nationstar violates 18 USC §1962(c) and has caused injury to Plaintiffs as contemplated by 18 USC §1964(c), in actual damages of emotional distress and attorneys fees and costs to defend their property and the integrity of this court.

236.    The conduct of BOA, Recontrust and Nationstar constitutes mail fraud in violation of 18 USC §1341 in that they devised or intended to devise a scheme or artifice to defraud Plaintiff and this court and executed this scheme or artifice by placing documents related thereto in the mail.

237.    The conduct of BOA, Recontrust and Nationstar constitutes mail fraud in violation of 18 USC §1343 in that they devised or intended to devise a scheme or artifice to defraud Plaintiff and this court and executed this scheme or artifice by placing documents related thereto by wire in interstate commerce.

238.    BOA, Recontrust and Nationstar devised or intended to devise a scheme or artifice to defraud Plaintiff and this Honorable Court to obtain Plaintiff's real property and used the United States Postal Service/Mail and wire communications several times in furtherance of the racketeering scheme to procure the Plaintiff's property using fraudulent, misleading and/or surrogate signed mortgage assignments.

239.    DocX CEO Lorraine Brown is presently serving a five (5) year prison sentence for mail and wire fraud arising from, *inter alia*, the fabrication of surrogate signed mortgage assignments recorded and presented as evidence to prove standing to foreclose.

240.    BOA, Recontrust and Nationstar subsequently engaged in similar malfeasance in other foreclosure proceedings all with the aim of obtaining title to real properties or profit from said properties which constitutes a pattern of racketeering activity as evidenced by the scheme or artifice to defraud Plaintiff and this Court that repeatedly used the United States Postal Service mail and wire communications in furtherance of the racketeering scheme to procure the Plaintiff's property using surrogate signed endorsements on original notes to establish standing.

241.    BOA, Recontrust and Nationstar engaged in fraudulent practices, false pretenses, and fraud generally in furtherance of the racketeering scheme to procure the Plaintiff's property using surrogate signed endorsements on original notes to establish standing.

242.    BOA, Recontrust and Nationstar engaged in perjury by testifying falsely that the endorsement rooms affixed rubber stamped endorsement signatures within days of the loan origination.

243.    BOA, Recontrust and Nationstar sent original notes to have unauthorized signors affix rubber stamped endorsement signatures of authorized signors outside their presence and control.

244.    These surrogate signing practices were used to affix endorsements to notes already in litigation.  Later, they were systemically affixed after the note went 90 days delinquent in anticipation of litigation.

245.    As a result, Plaintiff has incurred emotional distress and damages in having to incur attorneys fees to defend the instant action to protect their property.

## COUNT III
## WAIVER OF TENDER

246.    Plaintiff adopts and reavers the allegations from the paragraphs 1-245 as though fully set forth herein.

247.    On or about date October 30, 2008 Plaintiffs and Countrywide entered in to a mortgage loan modification agreement. **Exhibit "A"**

248.    The terms of said agreement are as follows:

a.    334 Month term, interest only;

b.    First payment due December 1, 2008;

c.    Monthly payment amount of $4743.65 per month representing interest and escrow;

d.    Principal balance $534,288.98;

e.    Principal due on September 1, 2036 (maturity date)

249.    The terms of accepting the loan midifucation offer required the Plaintiff to deliver the executed modification agreement on or before November 17, 2008;

250.    On or about October 29, 2008 Plaintiff signed the loan modification agreement;

251.    On or about October 30, 2008 Plaintiff signed a check tendering payment in the amount of $4743.65 to Defendant Nationstar and Bank of America's predecessor in interest, Countrywide. Said sum tendered represented the monthly payment set forth by Countrywide in said mortgage loan modification agreement. A copy of the check tendered by Plaintiffs is annexed hereto as **Exhibit "A"**.

252.    On or about November 11, 2008 Countrywide rejected Plaintiff's tender of the first payment by returning Plaintiff's check to Plaintiff. Countrywide did not attempt to negotiate Plaintiff's check.

253.    The returned check was accompanied by a written communication from Countrywide which letter stated that Countrywide could not accept payment in part of the entire amount owed. The letter communication further stated that the entire amount owed was the full amount due on the mortgage loan as of the date of the letter. A copy of the letter communication

dated November 22, 2008 that accompanied Plaintiffs' rejected check is annexed hereto as

**Exhibit "A"**.

254.    Countrywide's rejection of said check, refusal to even attempt to negotiate the

Plaintiff's check together with its letter communication established Countrywide's intent to

reject all future mortgage loan modification payments to be tendered by Plaintiff.

255.    Countrywide's letter disregarded the fact that the parties had agreed to modify the

mortgage loan.

256.    Defendants attached a copy of the Loan Modification Agreement with the letter

conferring terms of acceptance to its Proof of Claim filed in the instant case.

257.    Countrywide unilaterally breached its obligation to accept payments pursuant to

the mortgage loan modification agreement its successors now seek to enforce.

258.    Plaintiff was not and is not required to retender the check to Countrywide (or its

successors) as Countrywide stated that all attempts to pay any amount less than the full amount

of the arrears would be futile.

259.    Countrywide's rejection of Plaintiff's tender represents a tender by Plaintiff of an

agreed upon amount as an installment payment and a refusal of said payment by the Defendant.

260.    Countrywide's refusal of tender of payment numbered one and its stated intention

to dishonor all future payments udner the loan modification represents a waiver by Countrywide

of all payments pursuant to the mortgage loan modification agreement.


**<u>COUNT IV</u>**
**<u>Objection to Motion for Relief From Stay</u>**
**<u>Lack of Standing</u>**

261.    Plaintiff adopts and reavers the allegations from the paragraphs 1-260 as though

fully set forth herein.

262.    The documents offered in support of the Defendants' Motion for Relief From Stay fail to establish standing of the Defendant Nationstar and Defendant U.S. Bank in this federal court.

*a.     Defendants Nationstar and U.S.Bank Lack Standing As Per Applicable Federal Rules Of Civil Procedure And Bankruptcy Procedure*

263.    In the bankruptcy courts, procedure is governed by the Federal Rules of Bankruptcy and Civil Procedure. Procedure has an undeniable impact on the issue of "who" can assert a claim as a holder, because pleading and standing issues which arise in the context of our federal court system. According F.R.Civ. Pro. 17, "[a]n action must be prosecuted in the name of the real party in interest." (emphasis added)

264.    A Motion for Relief From Stay, is a contested matter, governed by F. R. Bankr. P. 9014(a), which makes F.R. Bankr. Pro. 7017 applicable to such motions. F.R. Bankr. P. 7017 is, of course, a restatement of F. R. Civ. P. 17.

265.    The Debtor avers that the real party in interest in a federal action to enforce a note, whether in bankruptcy court or federal district court, is the *owner and holder*, a status acquired through negotiation, of a note. Because the actual name of the actual note owner and holder is not only not stated but is actually misrepresented to this Court,  The Defendants' very claim asserted via motion is defective.

266.    In the case at bar, the Defendants, Nationstar and U.S.Bank establish only that neither are the holder nor the owner of the Plaintiff's note. Inso far as Defendant Nationstar is a loan servicer, it cannot enforce the note in its own right in that according to the information provided by Defendats not only is there no established relationship between Nationstar and U.S. Bank, there is no sound evidence of any negotiation of the note by Defendant U.S.Bank.

*b.     Defendants Lack Constitutional Standing To Seek Relief In A Federal Court*

267.    The United States Constitution Article III §2 specifically limits the jurisdiction of

the federal courts to "Cases or Controversies." Justice Powell delivered the Opinion of the Supreme

Court in the case of Warth v. Seldin addressing the question of standing in a federal court as

follows:

> "In essence, the question of standing is whether the litigant is entitled to have the
> court decide the merits of the dispute or of the particular issues. This query involves
> both constitutional limitations on federal court jurisdiction and prudential
> limitations on its exercise. In its constitutional dimension, standing imports
> judiciability: whether the plaintiff has made out a "case or controversy" between
> himself and the defendant within the meaning of Art.III. This is the threshold
> question in every federal case, determining the power of the court to entertain the
> suit. As an aspect of judiciability, the standing question is whether the plaintiff has
> "alleged such a personal stake in the outcome of the controversy" as to warrant his
> invocation of federal –court jurisdiction and to justify exercise of the court's
> remedial powers on his behalf. Baker v. Carr 369 U.S.186,204, 82 S.Ct. 691, 703,
> 7 L.Ed.2d 663(1962). The Art. III judicial power exists only to redress or otherwise
> to protect against injury to the complaining party…A Federal court's jurisdiction
> therefore can be invoked only when the plaintiff himself has suffered "some threat
> or actual injury resulting from the putatively illegal action…" Linda R.S. v. Richard
> D., 410 U.S. 614, 617, 93 S.Ct. 1146,1148, 35 L.Ed.2d 536 (1973)." Warth v.
> Seldin 422U.S.490, 498 (1975)

> "Apart from this minimum constitutional mandate, this Court has recognized other
> limits on the class of persons who may invoke the courts' decisional and remedial
> powers. … even when the plaintiff has alleged injury sufficient to meet the "case
> or controversy" requirement, this Court has held that the plaintiff generally must
> assert his own legal rights and interests and cannot rest his claim to relief on the
> legal rights or interests of third parties. E.g., Tilestion v. Ullman, 318 U.S. 44, 63
> S.Ct. 493, 87 L.Ed. 603 (1943)." Warth v. Seldin 422U.S.490, 499 (1975)
> (emphasis added)

268.    The Debtor in the instant case reiterates that a party seeking relief  in any Federal

Court "bears the burden of demonstrating standing and must plead its components with

specificity." Coyne v American Tobacco Company, 183 F.3d 488, 494 (6th Cir. 1999). Again, the

minimum constitutional requirements for standing are: proof of injury in fact, causation, and

redressability. Valley Forge Christian College v Americans United for Separation of Church &

State, Inc., 454 U.S. 464, 473 (1982). Furthermore, in order to satisfy the requirements of Article

III of the United States Constitution, any claimant asserting rights in a Federal Court must show

he has personally suffered some actual injury as a result of the conduct of the adverse party. Coyne,

183 F.3d at 494; Valley Forge, 454 U.S. at 472.

269.    Defendant Nationstar may only be a servicer and while a servicer may be able to

bring a claim on behalf of its principle, it must disclose the identity of its principle to the court and

set forth a valid claim of its principle.  (see generally In re Unioil 962 F 2d 988).  Nationstar's

blanket assertion if its status as a servicer is meaningless without support from Defendant

U.S.Bank.  Moreover, Defendant Nationstar offers only bogus fake assignments of mortgage and

bogus unauthentis rubber stamped indorsements on a note, neither confer standing on its principle,

Defendant U.S. Bank.

270.    It is well anticipated that Defendants will respond to this objection by asserting that

the assignments, regardless of validity, are unnecessary.  This phenomenon of submitting written

assignments and then arguing they are of no consequence or otherwise "unnecessary," is not

unique to the documents submitted in this Federal Court . In a February 2009 decision Wells Fargo

Bank, N.A., as Trustee for First Franklin Mortgage Loan Trust 2006-FF15, Mortgage Pass

Through Certificates, Series 2006-FF15 v. Sem M. Sait Aubin, et al 2009 NY Slip Op 50197(U)

(copy attached) NY Supreme Court Judge Arthur Schack was concerned for the authenticity and

motivation behind certain assignments in deciding a motion for summary judgment in a foreclosure

action. J. Schack denied plaintiff's motion expressing the court's reservations as to a series of two

questionable assignments , "…the Court requires an explanation from an officer of plaintiff Wells

Fargo explaining why, in the midst of our national subprime mortgage financial crisis, plaintiff

Wells Fargo purchased from MERS, as nominee for First Franklin, a nonperforming loan." And

further  noted that the motion was denied without predjudice provided the moving party, but 60

days to provide documentation which in part would , "(2) an affidavit from an officer of plaintiff,

WELLS FARGO BANK, N.A. AS TRUSTEE FOR FIRST FRANKLIN MORTGAGE LOAN

TRUST 2006-FF15, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-FF15,

explaining why plaintiff took the September 10, 2007 assignment of the instant nonperforming

loan, 102 days in arrears, from MORTGAGE ELECTRONIC REGISTRATIONS SYSTEMS,

INC., as nominee for FIRST FRANKLIN, A DIVISION OF NATIONAL CITY BANK; Wells

Fargo v. Sait Aubin p. 6

271.    J. Arthur Schack when presented with written assignments of questionable nature

in foreclosure actions has routinely not permitted the Plaintiff to switch gears after submitting such

writings to later claim that no writing is required. In fact, Judge Schack has taken the position that

once a writing is submitted, the court will require a thorough and complete verification of its

authenticity. Judge Schack has repeatedly denied plaintiffs motions in foreclosure actions

requiring additional verification pertaining to the authenticity of submitted assignments. WELLS

FARGO BANK, N.A., as Trustee for FIRST FRANKLIN MORTGAGE LOAN TRUST 2006-

FF15, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-FF15 v. SEM M.

SAINT AUBIN, ET. AL. 37401/07 Supreme Court of the State of New York, Kings County,

Decided February 10, 2009. ; DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee

Under Pooling and Servicing Agreement Dated as of April 1, 2007 Securities Asset Backed

Receivables, LLC Trust 2007-BR2 Mortgage Pass-through Certificates, Series 2007-br2 v.

LINDA BAILEY, ET. AL. 2009 NY Slip Op 50191(U) 3747/08 Supreme Court of the State of

New York, Kings County Decided February 9, 2009.; INDYMAC BANK, FSB v. RANDOLPH

BETHLEY; SONIA BADILLO ROSADO, ET. AL. 2009 NY Slip Op 50186(U) 9615/08 Supreme

Court of the State of New York, Kings County Decided February 6, 2009.

272.    The Plaintiff further objects to the falsified documents Defendants  purport to be an

assignment submitted to this court in support of its attempt at a Motion for Relief from Stay is void

under 11 U.S.C. §362. In fact, the so-called assignments have done little except to create a cloud

on the public record of this court proceeding by creating a discrepancy as to the chain of

assignments and transfers of the note and mortgage.

273.     As one Court described the bank's burden to show standing: "If the claimant is the original lender, the claimant can meet its burden by introducing evidence as to the original loan. If the claimant acquired the note and mortgage from the original lender or from another party who acquired it from the original lender, the claimant can meet its burden through evidence that traces the loan from the original lender to the claimant. A claimant who is the servicer must, in addition to establishing the rights of the holder, identify itself as an authorized agent for the holder." Maisel, 378 B.R. at 22 (quoting In re Parrish, 326 B.R. 708, 720 (Bankr. N.D. Ohio 2005)).

274.     Here, Defendant Nationstar (possibly as Servicer) has not demonstrated its standing to file a claim as servicer on behalf of the rightful owner and holder of the Plaintiff's mortgage note.

275.     Any attempt to entice the court's reliance on the painfully obvious bogus assignments of mortgage and unauthentic forged indorsement on the note is a fraud on the court.

276.     As set forth hereinabove, the named Creditor, Defendant U.S. Bank can make no assertions as to its own interest in the outcome of the instant claim it is making.  The named Creditor, Defendant U.S. Bank further fails to establish any clear, documented, perceived injury to itself.

277.     Defendants have not shown that the named Creditor, Defendant U.S. Bank has any stake in the ownership of the Note and Mortgage as either a holder or owner.  Any attempt to indicate the named Creditor, Defendant U.S. Bank as an owner of the Plaintiff's loan has been by way of fraudulent and misleading documents fabricated by employees of the Defendant Ocwen by persons who lack any personal knowledge as to the Plaintiff's mortgage loan.

278.     Defendants must demonstrate  how, when and from whom it derived her alleged rights.   In re Tandala Mims, 10- 14030(mg/scc), the Hon. Judge Martin Glenn denied Wells Fargo's  first attempted Motion for Relief from Stay on the Court's own motion in a written opinion dated October 27, 2010.  Thereafter, Wells Fargo renewed its motion a second time, claiming, in

part, possession of the original note endorsed in blank.  The court was not convinced, stating in its

December 9, 2010 Order denying Wells Fargo's Renewed Motion for Relief From Stay as follows:

> "With respect to the assignment of the note and mortgage, the October 27 Opinion
> stated: 'An assignment in anticipation of bringing a lift-stay motion does not in and
> of itself indicate bad faith. However, in the absence of a credible explanation,
> describing how, when and from whom Wells Fargo derived its rights, relief from
> the stay will not be granted.' Mims, 438 B.R. at 57 (emphasis added). The Renewed
> Motion provides some but not all of this information."

279.    A copy of Judge Glenn's order denying Wells Fargo's Renewed Motion for Relief

from Stay appears in the Mims ECF Docket as Document #42.

280.    In the instant case as in the Mims case, there is a complete lack of any credible

explanation describing how, when and from whom the named Creditor, Defendant U.S. Bank

derived any rights.  There is a clear question of fact as to the issue of Defendants' standing to file

a Motion for Relief From Stay or a Proof of Claim in the Plaintiff's bankruptcy case.

281.    To the extent the Defendants Nationstar and U.S. Bank filed the Proof of Claim 3-

1, it constitutes a gross and willful violation of the Automatic Stay pursuant to 11 U.S.C. section

362(a)(3) by the Defendants.

282.    As a result of the violation of the automatic stay as described herein, all Defendants

are liable to the Plaintiff  for actual damages, punitive damages and legal fees under 362(k)(1) of

the Bankruptcy Code.

283.    Accordingly, the Debtor's Objection should be sustained and relief granted.

### COUNT V
### Objection to Proof of Claim 3-1
### Lack of Standing and Fraud On the Court

284.    Plaintiff adopts and reavers the allegations from the paragraphs 1-283 as though

fully set forth herein.

285.    For all of the reasons stated hereinabove, the Plaintiff avers that the Proof of Claim

3-1 should be disallowed and expunged.

## COUNT VI
### Declaratory Judgment for a Void Lien under 11 U.S.C. 506(d)

286.    The Plaintiffs' repeat, reiterate and re-allege paragraphs 1 through 279 with same force and effect as if fully set forth at length herein.

287.    Section 506(d) of the United States Bankruptcy Code (the "Code") provides, in relevant part:

(a)    To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void, unless —

(1)    such claim was disallowed only under section 502 (b)(5)[1] or 502 (e)[2] of this title; or

(2)    such claim is not an allowed secured claim due only to the failure of any entity to file a proof of such claim under section 501 of this title."

11    U.S.C. § 506(d)(1)-(2).

288.    None of the exceptions to 11 U.S.C. 506(d) applies to the Court's disallowance of Defendants' Proof of Claim 3-1.

289.    To the extent that the Proofs of Claims by Defendants Nationstar and U.S. Bank are disallowed and do not fall under any of the above exceptions, the alleged liens claimed by Defendants on Plaintiff's property should be declared void under 11 U.S.C. 506(d).

## COUNT VII
### Sanctions and Damages under 11 U.S.C. § 105(a) as against All Defendants

284.    The Plaintiffs' repeat, reiterate and re-allege paragraphs 1 through 289 with same force and effect as if fully set forth at length herein.

---

[1] Such claim is for a debt that is unmatured on the date of the filing of the petition and that is excepted from discharge under section 523 (a)(5)of this title;

[2] Notwithstanding subsections (a), (b), and (c) of this section and paragraph (2) of this subsection, the court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on or has secured the claim of a creditor, to the extent that—**(A)** such creditor's claim against the estate is disallowed; **(B)** such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution; or **(C)** such entity asserts a right of subrogation to the rights of such creditor under section 509 of this title.

285.    Section 105(a) of the Code provides as follows:

(a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.       11 U.S.C. § 105(a).

286.    The Court should impose monetary sanctions against the Defendants under its inherent powers under 11 U.S.C. § 105(a) as a result of the Defendant's egregious conduct and filing of false fabricated documents with this court.

287.    Such insistence by the Defendants on continued filing of false documents in a court of law for the purpose of deceiving the Debtor, the Chapter 13 Trustee, the Creditors, and the Federal Bankruptcy Court should not be allowed.

288.    The Plaintiff implores this Court to make use of its inherent powers and do something to end the continued practices of using false documents and forged note indorsements.

**WHEREFORE**, Plaintiffs pray that the Court grant the relief requested herein and issue a Declaratory Judgment and Order holding (1) the Proof of Claim by Defendants be disallowed and expunged; (2) the alleged lien of Defendants on Plaintiff's Premises should be declared void under 11 U.S.C. 506(d); (3) awarding the Plaintiffs' actual damages, attorneys' fees, costs, expenses and disbursements (4) Imposing monetary sanctions on Defendants; (5) and for such other and further relief as to the Court may seem just and proper.

Dated: November 28, 2016
       At White Plains, NY

RESPECTFULLY SUBMITTED,

*/S/ LINDA M. TIRELLI*
Linda M. Tirelli, Esq.
Garvey Tirelli & Cushner, Ltd.
*Lead Attorney for Plaintiffs*
50 Main Street, Suite 390
White Plains NY 10606
Phone: (914)946-2200/Fax: (914)946-1300
LindaTirelli@TheGTCFirm.com

By: /S/ BRUCE JACOBS
    BRUCE JACOBS, ESQ.
    **JACOBS KEELEY, PLLC.**
    *CO-COUNSEL FOR PLAINTIFF*
    ALFRED I. DUPONT BUILDING
    169 E. FLAGLER STREET, SUITE 1620
    MIAMI, FLORIDA 33131
    Tel.:  (305) 358-7991
    Fax:  (305) 358-7992
    **Eservice email: efile@jakelegal.com**