IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy No. 08-18700 |
| | ) | |
| | ) | |
| | ) | |
| JOHN T. KEMP, | ) | |
| | ) | |
| Debtor. | ) | |
| --------------------------------) | | |
| | ) | |
| JOHN T. KEMP, | ) | Adversary No. 08-02448 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| COUNTRYWIDE HOME LOANS, INC., | ) | Camden, New Jersey |
| | ) | August 11, 2009 |
| Defendant. | ) | 10:24 a.m. |
| | ) | |
| --------------------------------) | | |


TRANSCRIPT OF HEARING
BEFORE THE HONORABLE JUDITH H. WIZMUR
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:


For the Plaintiff:        BRUCE LEVITT, ESQUIRE
                          LEVITT & SLAFKES, PC
                          76 South Orange Avenue, Suite 305
                          South Orange, New Jersey, 07079
                          Cherry Hill, New Jersey  08003


For the Defendant:        HAROLD KAPLAN, ESQUIRE
                          FRENKEL, LAMBERT, WEISS, WEISMAN
                          & GORDON, LLP
                          80 Main Street, Suite 460
                          West Orange, New Jersey  07052


Audio Operator:           NORMA SADER

```
Transcribed by:          DIANA DOMAN TRANSCRIBING SERVICES
                         P.O. Box 129
                         Gibbsboro, New Jersey  08026-0129
                         Phone:   (856) 435-7172
                         Fax:     (856) 435-7124
                         E-mail:   dianadoman@comcast.net
```

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1         LINDA DeMARTINI, DEFENSE WITNESS, SWORN

2         THE COURT:  Please have a seat.  Your full name,

3    first and last, and spell your last name, please.

4         THE WITNESS:  My name is Linda DeMartini.  The last

5    name is spelled D-E capital M-A-R-T-I-N-I.

6                      DIRECT EXAMINATION

7    BY MR. KAPLAN:

8    Q   Okay, Ms. DeMartini, would you -- who are you employed by?

9    A   I am employed by Bank of America Home Loans, formally

10   known as Countrywide Home Loans.

11   Q   Okay.  And how long have you been employed there?

12   A   A total of almost ten years.

13   Q   And what is your position there?

14   A   I am an operational team leader for the Litigation

15   Management Department currently.  I've been there just about a

16   year.

17   Q   Are you familiar with the documents relating to Mr. Kemp's

18   mortgage loan?

19   A   Yes, I am.

20   Q   Okay.  Now who, based upon your knowledge of the loan

21   documents, who's presently the owner, holder, transferee of

22   the note?

23   A   Well, the owner as in the investor, that would be Bank of

24   New York, and we -- we are the servicer, Bank of America Home

25   Loan, Servicing, LP, formally known as Countrywide Home Loan

DeMartini - Cross                                    4

1    Servicing, LP.

2    Q    Okay.

3          MR. KAPLAN:  I'd like this marked as I guess D-1.

4    Okay, may I approach the witness, Your Honor?

5          THE COURT:  Yes.

6    BY MR. KAPLAN:

7    Q    Could you tell the Court what that document is?

8    A    That's the allonge to the promissory note.

9    Q    And is that the original?

10   A    Yes, this is.

11   Q    And it references -- what -- could you -- and who signed

12   that document?

13   A    Sharon Mason.

14   Q    And what's Ms. Mason's position with Country --

15   A    She is Vice President.  She's actually part of our

16   Bankruptcy Risk Litigation Management Department.  She's

17   actually my boss's boss.

18   Q    Okay.  And you're familiar with Ms. Mason's signature?

19   A    Yes, I know it very well.

20   Q    And that's Ms. Mason's signature?

21   A    Definitely.

22   Q    And the allonge is -- the purpose of the allonge?

23   A    It shows the transfer to Bank of New York as the trustee.

24   Q    Okay.  So it -- it's your testimony that Bank of New York

25   is trustee as the holder or the investor of that loan?

DeMartini - Cross                                    5

1    A   Yes, that's correct.

2              MR. KAPLAN:  Your Honor, essentially she has

3    testified to the document.  I really don't have any other

4    questions that --

5              THE COURT:  Well, let's cross.

6                        CROSS-EXAMINATION

7    BY MR. LEVITT:

8    Q   Ms. DeMartini, you said you're familiar with the loan

9    documents?

10   A   Hm-hmm.

11   Q   What do they consist of?

12   A   Well, we've got the notice there, the mortgage is there.

13   In our system we have any of the documents -- settlement

14   statement, title policy, every single document that would have

15   been signed at the time that the loan was taken out.

16   Q   When was the first time that you saw those documents?

17   A   A few weeks ago.

18   Q   Were you at all involved in the preparation of the proof

19   of claim?

20   A   No, I was not involved in the proof of claim.  That would

21   have been before it got to the Litigation Department.

22   Q   When was the first time that you saw the allonge to the

23   promissory note?

24   A   Approximately two weeks ago.

25   Q   And how was it that you came to see the allonge to the

DeMartini - Cross                                              6

1   promissory note?

2   A   Well, in my role as a supervisor in the department I have

3   litigation specialists who work for me.  When cases are coming

4   up, I review their cases as a regular matter of course so I'd

5   be reviewing the documents with that.  When this date came up

6   as far as having this hearing today and it became known to me

7   that I was most likely going to be the one traveling here to

8   be a part of it, I made sure that I got involved in every

9   aspect of the case.

10  Q   When was this allonge prepared?

11  A   This allonge would have been prepared by my specialists.

12  I don't have the exact date committed to memory, but this

13  would have been done within the last couple of months most

14  likely.

15  Q   So one of your employee's prepared the allonge?

16  A   One of my employee's would have taken -- would have gotten

17  the allonge and we would have been the ones that obtained the

18  signature from Sharon, yes.

19  Q   So it was just recently signed?

20  A   Fairly recently signed, yes.

21  Q   Signed essentially in contemplation or in the course of

22  this litigation, correct?

23  A   Most likely.

24  Q   And it was prepared in your office?

25  A   It would have been -- whether it was originally prepared

DeMartini - Cross                                    7

1    in my office or not I can't answer to that.  I can tell you it

2    was signed in our office because Sharon's the one that signed

3    it --

4    Q    So the original --

5    A    -- and I've been to her office.

6    Q    -- the original was located in your office?

7    A    Yes.

8    Q    Where's your office located?

9    A    Simi Valley, California.

10   Q    And has the original of this allonge remained in your

11   office until you appeared here today?

12   A    We had sent it on to -- to our attorneys.  They were in

13   possession of it.

14   Q    And again, who do you believe is the holder of the note

15   and mortgage here?

16   A    Well, Countrywide -- Bank of America -- whatever we're

17   calling ourselves these days, we are Bank of America now -- we

18   originated this loan.  It was originated via a broker and it's

19   really always been a Countrywide loan.  The investor is Bank

20   of New York.  We are the servicer of the loan.

21   Q    Now, when you say it's really a Countrywide loan, wasn't

22   it sold?  Wasn't this loan securitized and ultimately sold --

23   sold to this trust?

24   A    Right, it would have been securitized and sold.  They are

25   the investors of the loan.  But we are the ones that would

DeMartini - Cross                                          8

1    have originated it, we are the ones that have always serviced

2    it.

3    Q    Today who is the owner of the loan?

4    A    Bank of New York.

5    Q    Bank of New York?

6    A    As -- as the trustee for the certificate holder CWABS,

7    Asset-Backed Securities series number --

8    Q    And who is in possession of the note?

9    A    Who is in possession of the note?  We have the note in our

10   origination file.

11   Q    So -- so Bank of New York as trustee does not hold the

12   note, is that correct, or is not in possession of the note?

13   A    The original note to my knowledge is in the origination

14   file.

15   Q    Where is the -- do you have it here today?

16   A    No, I don't have it with me here today.

17   Q    So you don't have the note?

18   A    It's in our office.

19   Q    So it's in your office, it's not with this trust that owns

20   the -- that's supposedly holds the -- or is the owner of this

21   note, is that correct?

22   A    That's correct.

23   Q    And your testimony is that this allonge was never

24   submitted to -- it was never in the possession of Bank of New

25   York as trustee for the certificate holder, is that correct?

DeMartini - Cross                                              9

1            MR. KAPLAN:  Your Honor, I object.  Countrywide or

2     Bank of America is the servicer.  They possess and hold all

3     the documents.

4            THE COURT:  Don't give me an argument, that's not an

5     objection to the question.  I don't mean to be -- to cut your

6     off, but you're welcome to make that argument bottom line, but

7     that's a perfectly proper question.

8     BY MR. LEVITT:

9     Q   And this allonge, it's a stand-alone document, correct?

10    It's not attached to anything, is that correct?

11    A   I'm not sure I'm understanding your question.

12    Q   Was there anything -- when you brought the original that's

13    in front of you, did you remove it?  Was it stapled to

14    something else?

15    A   No, it wouldn't have necessarily been stapled to something

16    else.  There would have probably been other documents showing

17    the -- you know, we would have shown her the note.  We would

18    have reviewed all of that before.

19    Q   And where are all the documents that you showed her?

20    A   Well, I have copies of -- I have a copy of the note, I

21    have a copy of the deed with me here today.

22    Q   And those --

23    A   They're signed copies.

24    Q   Can you show me exactly the documents that you showed her

25    when you had her sign this allonge?

1   A   They're probably right -- well, they would be in that

2   clump there.  That's mostly the Pooling and Servicing

3   Agreement, the larger one.

4   Q   This one?

5   A   Yeah.  There's the note in there, there's the deed and the

6   mortgage and you sign it.

7   Q   You just --

8           MR. KAPLAN:  May I provide this --

9           MR. LEVITT:  -- I'm sorry.

10           MR. KAPLAN:  -- provide this note?

11           MR. LEVITT:  Yeah, go ahead.

12           THE WITNESS:  Because this was provided to me by my

13   specialist to -- to bring along so that I have the documents

14   here for you today.

15   BY MR. LEVITT:

16   Q   Let me ask you this.  Did you show those documents to --

17   is it Sharon Mason?

18   A   Did I personally show the documents?  Whoever brought her

19   -- and to be honest with you, I don't know if it was me or my

20   specialist, Dee, who brought them to her -- whoever brought

21   them to her would have had them with them, yes, whichever of

22   the two of us.

23   Q   Who brought them to her?

24   A   Generally speaking, it would have been me, but I don't

25   recall bringing this particular one to her so I believe it was

1    Dee.

2    Q    So you don't recall bringing it, you don't recall -- and

3    you don't know what documents were shown to her, is that

4    correct?

5    A    No, I know what documents were shown to her because

6    they're right here and they -- and they're all together.

7    Q    Did you bring those documents to Sharon Mason?  Did you

8    personally?

9    A    Not to my knowledge, no.

10   Q    Do you know specifically who brought those documents to

11   Ms. Mason?

12   A    My specialist, Dee.

13   Q    And you saw her bring the documents to Ms. Mason?

14   A    Did I physically stand over her --

15   Q    Yes.

16   A    -- and witness it?  No.

17   Q    Okay.  Is the original note in that stack of documents?

18   A    An imaged copy of the signed note is in here.

19   Q    Is --

20   A    The absolute original, no, it is not.

21   Q    And again, my question before was was this attached to the

22   note?  This allonge, was it attached physically, with a

23   staple, with a piece of glue -- was it attached?

24   A    With a staple?  No, because then it would have a hole in

25   it.  But it would have been brought along with it.  We would

DeMartini - Cross                                    12

1    have shown it to her.

2    Q    But again, now again getting back to my other question, so

3    this is a stand-alone document, it wasn't attached to

4    anything?

5    A    Okay, then yes.

6    Q    Okay.  And can you take a look at the -- what you believe

7    to be the good copy of the note that you have?

8    A    Okay.

9    Q    Do you mind separating it from the rest of the papers?

10   A    Sure, I'll take it apart.

11              (Pause in proceedings)

12   A    Okay, and your question?

13              MR. LEVITT:  Your Honor, may I approach the witness?

14              THE COURT:  Sure.

15   BY MR. LEVITT:

16   Q    Not the mortgage, the note --

17   A    Yeah, I've got all kinds of stuff.

18              MR. LEVITT:  Your Honor, if you could excuse us one

19   second.  There seems to be a discrepancy between what the

20   witness has and what my office was provided.

21              THE COURT:  Certainly.

22              MR. KAPLAN:  Judge --

23              THE COURT:  And while you look at that, let me see

24   what's going on with the other case.  You're welcome to take a

25   few minutes.

DeMartini - Redirect                                    13

1           (The Court hears another matter)

2               MR. LEVITT:  Your Honor, with counsel's permission,

3      since we have stipulated, I'd like to provide a copy to Your

4      Honor.

5               THE COURT:  All right.  Is this a copy that we can

6      mark?

7               MR. LEVITT:  It's an exact copy and we can mark that

8      as joint Exhibit 1, I believe.

9               THE COURT:  J-1, interest only adjustable rate note.

10     BY MR. LEVITT:

11     Q   Now, that document is the note that was contained in your

12     file?

13     A   Yes.

14     Q   And there's no endorsement on the last page of that note,

15     is there?

16     A   No --

17     Q   There's --

18     A   -- there's no signature.

19     Q   Is there room on the bottom if somebody wanted to put Pay

20     To The Order Of?  Would there be room on the bottom?

21     A   Well, I'm sure you could find a way to fit it in.

22     Q   Okay.

23               MR. LEVITT:  I have no further questions of this

24     witness, Your Honor.

25               THE COURT:  All right.

DeMartini - Redirect                                    14

1        MR. KAPLAN:  Cross-examine, Your Honor?

2        THE COURT:  Please, please.

3                  REDIRECT EXAMINATION

4   BY MR. KAPLAN:

5   Q   Ms. DeMartini, is it generally the custom to -- for your

6   investor to hold the documents?

7   A   No.  They would stay with us as the servicer.

8   Q   And are documents ever transferred to the investor?

9   A   If we service-release them they would be transferred to

10  whomever we're service-releasing them to.

11  Q   So I believe you testified Countrywide was the originator

12  of this loan?

13  A   Yes.

14  Q   So Countrywide had possession of the documents from the

15  outset?

16  A   Yes.

17  Q   And subsequently did Countrywide transfer these documents

18  by assignment or an allonge?

19  A   Yes.

20  Q   And --

21  A   Well, transferred the rights, yes, transferred the

22  ownership, not the physical documents.

23  Q   So the physical documents were retained within the

24  corporate entity Countrywide or Bank of America?

25  A   Correct.

DeMartini - Recross                              15

1    Q    Okay.  And would you say that this is standard operating

2    procedure in the mortgage banking business?

3    A    Yes.  It would be normal -- the normal course of business

4    as the reason that we are the servicer, as we're the ones that

5    are doing all the servicing, and that would include retaining

6    the documents.

7    Q    Now, you were asked about whether or not the note could be

8    -- was endorsed at the bottom.  Is it generally the practice

9    to endorse the actual note or to use an allonge?

10   A    It's -- I've never seen an actual note that has an

11   endorsement on the bottom.

12   Q    So would you say it's normal --

13   A    It's generally more --

14   Q    -- to have an allonge?

15   A    Yeah, it would be more normal to have an allonge.

16   Q    Okay.  And once the allonge was signed, what would

17   generally happen to the allonge?

18   A    Well, it would also be imaged and it would be recorded and

19   it would be put in our system and it would be kept as a normal

20   course.  In a situation like this, we forwarded it onto the

21   attorneys because of the case but --

22   Q    Okay.  And if it had not been forwarded to the attorneys,

23   what would have happened to the allonge?

24   A    It would have ended up in the file with everything else.

25   Q    And the note attached to it?

DeMartini - Redirect                    16

1   A   Yes.

2   Q   Thank you.

3          MR. KAPLAN:  I have no further questions, Your

4   Honor.

5          MR. LEVITT:  Just briefly, Your Honor.

6                      RECROSS-EXAMINATION

7   BY MR. LEVITT:

8   Q   Ms. DeMartini, you testified that this allonge was just

9   prepared a couple of weeks ago, correct?

10  A   Yeah, a short time ago, yes.

11  Q   And wasn't it prepared because counsel called up and said

12  we need and allonge?

13  A   Yes.

14  Q   So it wasn't your normal course to have an allonge in this

15  situation, correct?

16  A   Well --

17  Q   When was this loan made?

18  A   This loan was taken out I believe in 2006 -- yes.

19  Q   So between 2006 and 2009 when you got a phone call from

20  counsel that said we've got a problem, prepare an allonge,

21  there was no allonge, correct?

22  A   There wasn't an allonge prior to that, no.  This loan,

23  like I said, it was always -- this was a loan that we

24  originated that has always been within the company that yes,

25  it was sold to -- as Bank of New York as the trustee and

DeMartini - Redirect                              17

1    securitized, but there wasn't a need for an allonge prior to

2    this case.

3    Q    Because there was no litigation pending, correct?

4    A    Well, because there was no litigation --

5    Q    Thank you.

6    A    -- and because there was nothing to -- to get in the way

7    of the fact of the normal course of -- of the way that this

8    loan's being executed and being --

9    Q    That's fine.

10   A    -- being serviced.

11   Q    Thank you.

12              MR. LEVITT:  That's it, Your Honor.

13              MR. KAPLAN:  One more question, Your Honor.

14                     REDIRECT EXAMINATION

15   BY MR. KAPLAN:

16   Q    Was it the intention of Countrywide to assign both its

17   rights in the mortgage and the note to Bank of -- to Bank of

18   New York as trustee?

19   A    Yes.

20              THE COURT:  Say that again?

21   BY MR. KAPLAN:

22   Q    Was it the intention of Countrywide to assign its rights

23   in both the note and the mortgage to Bank of New York?

24              MR. LEVITT:  I'm going to object to the question,

25   Your Honor.  I'm not sure this witness is competent to answer

DeMartini - By the Court                                      18

1     that question based upon the foundation laid.

2                THE COURT:  I agree.

3                MR. KAPLAN:  Well, Your Honor, they -- to the extent

4     that there wasn't a physical document at some -- at the time,

5     they remediated that by signing the allonge and facilitating

6     their intentions.

7                THE COURT:  Well, that's certainly a valid argument,

8     but it's not -- it still doesn't answer the question of

9     whether Ms. DeMartini can speak for Countrywide in terms of

10    their intent in doing anything.

11               MR. KAPLAN:  Well, it's evidence that it was their

12    intent to assign the mortgage.

13               THE COURT:  It very well may be, and we'll leave it

14    at that.

15               MR. KAPLAN:  Okay.

16               THE COURT:  Objection sustained.  Let me ask you a

17    couple of questions.

18                              <u>EXAMINATION</u>

19    BY THE COURT:

20    Q    There was an unexecuted allonge to America's Wholesale

21    Lender that was filed with the proof of claim.  Is that in

22    your file as well, that --

23    A    Yeah.  I have the -- the unsigned copy in there.

24    Q    And it is unsigned?

25    A    The old one?  Yeah, that's the -- the copy I have, it

DeMartini - By the Court                                19

1    looks like it's unsigned, yeah.

2    Q    So is it the normal practice of Countrywide not to sign

3    allonges in the normal course?

4    A    I can't answer to why that one was unsigned and that was

5    in there.  When a loan goes into bankruptcy, our Bankruptcy

6    Department is the one that would be the ones actually

7    preparing and filing the proof of claim.  Our group gets

8    involved when things turn to litigated matters --

9    Q    But I'm not --

10   A    -- and so that's why I can't speak to what they do in

11   their -- in their normal course of action.  I haven't seen an

12   unsigned one before.

13   Q    Well, I'm not talking about the process of filing a proof

14   of claim.  I'm talking about the customary business practice

15   of Countrywide when a loan is transferred, when ownership is

16   transferred, when in this case the mortgage assignment

17   occurred on March 24th, 2008, correct?

18   A    Yes.

19   Q    And would that have been the date that the ownership of

20   the note and mortgage were sought to be transferred to Bank of

21   New York as trustee?

22   A    That would have been the day they got the ownership, yes.

23   Q    So the question is whether you know whether it's normal

24   practice for Countrywide to execute an allonge at the time

25   that that transfer takes place.

DeMartini - By the Court                      20

1    A    I don't believe that they're always executed exactly when

2    the transfer takes place.  I believe that it often times

3    happens that it happens after the fact.

4    Q    And does it always happen?

5    A    I can speak that it always happens, no.

6    Q    So there's no routine that requires internally, to your

7    knowledge, that the allonge be executed in connection with the

8    transfer of ownership?

9    A    No, I don't think that there is a norm in that respect

10   because in a normal course of action and for -- and normal is

11   kind of a hard word anyway -- but --

12   Q    A normal business practice, an ordinary --

13   A    -- but as a normal business practice with a normal loan,

14   often times there really isn't a need for it unless the loan

15   is going to continually to be sold, and since this loan was --

16   yes, it was transferred to Bank of New York as trustee as it

17   was securitized, but it wasn't that another mortgage company

18   had the loan and then we bought it from them.  Like I

19   mentioned, this was always done by Countrywide and we

20   securitized it and we -- you know, we sold it to them --

21   Q    This was done --

22   A    -- and so --

23   Q    -- I'm not asking whether it was necessary, I am asking

24   whether there was an ordinary business practice to sign an

25   allonge and the answer is no, there was not?

DeMartini - By the Court                              21

1   A   I don't believe so.

2   Q   Countrywide, the same entity as the originator of the

3   loan, serviced the loan from the outset or was it a different

4   aspect of the company?

5   A   No.  It would have always been the same.  Even though Bank

6   of America has taken over Countrywide so to speak and we are

7   now wholly owned by Bank of America, all of the Countrywide

8   loans are still being serviced and the Bank of America --

9   prior Bank of America loans, they're all still being serviced

10  and done separately.  This has always been by Countrywide.

11  Q   Okay.  Putting aside the takeover by Bank of America, this

12  loan was given on May 31st, 2006, correct?

13  A   Yes.

14  Q   And when the loan was given, after the loan was given,

15  Countrywide Home Loans, Inc. retained the servicing on the --

16  A   Yes, that's correct.

17  Q   And as of March 24th, 2008, that continued to be the case,

18  is that right?

19  A   That's correct.

20  Q   And there was a Pooling and Servicing Agreement between

21  Countrywide and --

22  A   Bank of New York.

23  Q   -- Bank of New York --

24  A   Yes.

25  Q   -- regarding the continued servicing of the loan, is that

Levitt - Argument                                    22

1    right?

2    A    That's correct.

3    Q    And to your knowledge -- I think you might have the

4    servicing arrangement --

5    A    Yes, I brought a copy of it.

6    Q    -- with you, to your knowledge, is there any provision

7    that in the servicing of this loan that Countrywide acts as

8    the agent for Bank of New York in terms of possession of

9    original documents including the note in connection with this

10   transaction?

11   A    I have the Pooling and Servicing Agreement there.  It's

12   over 200 pages long.  I'll be very honest; I did not read the

13   entire Pooling and Servicing Agreement.  I do know that it is

14   our normal course of action with the loans that we service

15   that we are the ones that retain the -- that we retain those

16   documents.

17   Q    Could such a clause be included in that, and if there were

18   such a clause, would that -- what would be the effect of that?

19   Should I look for that clause?  Should I ask you to look for

20   that clause, or is it a fruitless enterprise?

21         MR. LEVITT:  Your Honor, I think -- and I have it

22   also and it is a very thick document, Your Honor -- there are

23   other provisions in this document that I think would be --

24   even if there was something in there that says they could

25   retain documents, there's other provisions in this document

Levitt - Argument                                      23

1    which would be contradictory because there's provisions in the

2    Pooling and Servicing Agreement that say that documents have

3    to be delivered to an intermediary between Bank of America and

4    Bank of New York, the --

5        THE COURT:  Well, shouldn't I consider all of that?

6    In other words, your -- one of your key points is the note was

7    not properly transferred because possession of the original

8    note was not given to the new owner, is that right?

9        MR. LEVITT:  Partially, Your Honor.

10       THE COURT:  Okay.

11       MR. LEVITT:  But again, I'm not --

12       THE COURT:  What's the --

13       MR. LEVITT:  -- but I'm not raising --

14       THE COURT:  What part of it is --

15       MR. LEVITT:  -- but I'm not -- I'm not defending

16   this.  The proofs that have been submitted to the Court are

17   that there's a piece of paper that they're calling an allonge

18   that was prepared in the course of this litigation that

19   they're relying on as an endorsement.

20       THE COURT:  You're right.

21       MR. LEVITT:  I haven't --

22       THE COURT:  You're right, but --

23       MR. LEVITT:  But I haven't heard --

24       THE COURT:  -- I'm asking the question, and maybe it

25   should have been asked otherwise, but if there is such a

Levitt - Argument                                          24

1    provision in the servicing agreement about the retention of

2    possession as agent for the owner --

3            MR. LEVITT:  And if -- if --

4            THE COURT:  -- what part of your argument is it?  In

5    other words, you say possession of the document is part of the

6    argument.  What else is a part of the argument?

7            MR. LEVITT:  No, but possession -- you have to have

8    possession of the document but in addition to possession, you

9    either have to have an endorsement, or you have to have proof

10   that these documents were actually transferred to the ultimate

11   owner, even if the agent for the owner is holding them.  But

12   there still has to be proof that it was delivered from A to B

13   to C but none of those proofs have been submitted and it's not

14   my burden, Your Honor.

15           If counsel wants to say all right, forget the holder

16   argument, I lost on holder but here's my case that this note

17   was transferred from A to B to C, here's the delivery receipts

18   and yeah, it may be sitting in somebody's vault in California

19   and not with this trust, fine.  But I haven't heard those

20   proofs and I don't think the Pooling and Servicing Agreement

21   gives us that, Your Honor.  We need to see the delivery

22   receipts, we need to show the chain and there's nothing before

23   the Court.

24           THE COURT:  Understood.  Mr. Kaplan, is there

25   anything in those documents in the Pooling and Servicing

Levitt - Argument                                    25

1    contract that would --

2            MR. KAPLAN:  That's a good question, Your Honor,

3    but, you know --

4            THE COURT:  Don't you think you --

5            MR. KAPLAN:  -- and I believe the witness's

6    experience is that documents are not physically transferred

7    from party to party to party.

8            THE COURT:  But it's not experience that we're

9    talking about, it's UCC requirements.

10           MR. KAPLAN:  I understand.

11           THE COURT:  Is Mr. Levitt right when he says that

12   some kind of delivery of possession is required in order to

13   qualify as a transferee, not a holder?  I think we've pretty

14   well established that the affixing that is required for holder

15   in due course status as not apparent in this case, has not

16   been established, but if you establish under UCC requirements

17   that there is a proper transfer, there may still be

18   opportunity to enforce the obligation.

19           MR. KAPLAN:  Right.  Your Honor, I understand but, I

20   mean, there's no way I'm going to argue that there was a

21   physical transfer.  Countrywide was the servicer, the

22   originator.  They had the documents --

23           THE COURT:  Right, there was no --

24           MR. KAPLAN:  -- they physically signed the necessary

25   documents required to document their ownership interests being

Kaplan - Argument                                26

1        transferred to the trust --

2                THE COURT:  That's the issue.  In other words,

3        I'm --

4                MR. KAPLAN:  -- but they didn't physically deliver

5        it.

6                THE COURT:  -- I'm raising the possibility that the

7        Pooling and Servicing Agreement might contain provisions that

8        would serve to offer Countrywide an out, meaning I'm not --

9        you know, here to advocate Countrywide's cause, but I am here

10       to get to the -- as close as I can to what should happen here.

11               MR. LEVITT:  Your Honor, I'll answer the question

12       because I did see in the index -- and if Your Honor would like

13       I can hand up the Pooling and Servicing Agreement.  This is

14       the Pooling and Servicing Agreement that was provided by the

15       defendant and I'll call your attention to Section 8-13.

16               THE COURT:  Thank you.

17               MR. KAPLAN:  What page is he on?

18               MR. LEVITT:  It's 150.

19               THE COURT:  8.13, "Access to records of the trustee.

20       The trustee shall afford the sellers, the depositor, the

21       master servicer, the NIM Insurer and each certificate owner

22       upon reasonable notice during normal business hours access to

23       all records maintained by the trustee" --

24               MR. LEVITT:  That tells me the trustee has the

25       records, Your Honor.  That's as close as I can get.  But I'll

Kaplan - Argument                              27

1    let you finish.

2              THE COURT:  Well, yes, that doesn't seem to get at

3    it.  If there is no authority in this document for Countrywide

4    to act as the agent for the trustee in maintaining the

5    original documents, then we face squarely the question of

6    whether lack of possession by the owner, the retention of

7    possession by the servicer, violates the transferee status of

8    the owner, or whether the servicer who filed the proof of

9    claim can stand by that status to succeed against this

10   challenge.

11             MR. KAPLAN:  Well, Your Honor, the servicer has

12   authority to act in servicing the loan, including filing a

13   proof of claim under the Pooling and Servicing Agreement.  In

14   addition, I believe there's a power or attorney that Bank of

15   New York has provided to Countrywide to act on their behalf to

16   administer --

17             THE COURT:  Well, where is that?

18             MR. KAPLAN:  I'd be happy to provide that to Your

19   Honor.  Okay, we can mark that as Defendant's Exhibit 2.

20             THE COURT:  Did we mark this copy of the servicing

21   agreement as Defendant's Exhibit 3?

22             MR. KAPLAN:  That's fine, Your Honor.

23             THE COURT:  And did we allow you a chance to look at

24   this document to ascertain what in it might be helpful to

25   you --

1          MR. KAPLAN:  Your Honor, there's --

2          THE COURT:  -- rather than just leaving it to me to

3     peruse?

4          MR. KAPLAN:  Well, that's fine, Your Honor, we'll be

5     happy to go through and submit to Your Honor references to the

6     various provisions in the document.

7          THE COURT:  Okay, let's take a look, D-2, power of

8     attorney signed by the trustee.  "Under the Pooling and

9     Servicing Agreements" -- "constituting and appointing

10    Countrywide Home Loan Servicing, LP full power of substitution

11    and re-substitution for the limited purpose of executing and

12    recording any and all documents necessary to effect a

13    foreclosure of a mortgage loan, the disposition of an REO

14    property, an assumption agreement or modification agreement to

15    supplement -- or supplement to the mortgage note, mortgage or

16    deed of trust and a reconveyance, deed of reconveyance or

17    release or satisfaction of mortgage or such instrument

18    releasing the lien of a mortgage in connection with the

19    transactions contemplated in those certain Pooling and

20    Servicing Agreements, by and among the undersigned," et

21    cetera.

22          "The undersigned also grants" -- "full power and

23    authority to do and perform each and every act and thing

24    requisite and necessary to be done in and about the premises

25    as fully to all intents and purposes as might or could be done

Kaplan - Argument                                    29

1    in person to effect items one, two and three above, hereby

2    ratifying and confirming all that said attorneys in fact and

3    agents or any of them or their substitutes may lawfully do or

4    cause to be done by virtue hereof."

5          Well, there's a question mark -- does this power of

6    attorney authorize the agent/servicer to hold the original

7    documents in substitution for and satisfaction of the

8    requirements of the UCC.  I mean, that's a question mark.

9          MR. KAPLAN:  I understand.  I understand, Your

10   Honor.  But, I mean, Your Honor's probably familiar, mortgage

11   lenders and servicers don't normally transfer documents back

12   and forth in order to effectuate physical transfer.  They

13   utilize agents or servicers to execute documents and retain

14   the documents and they don't send them across the country by

15   messengers or Federal Express to go to different vaults to be

16   maintained because --

17         THE COURT:  And that's fine.  That's --

18         MR. KAPLAN:  And that's standard --

19         THE COURT:  I mean, I'm not accepting your testimony

20   as an expert --

21         MR. KAPLAN:  Yeah, I know, I know.

22         THE COURT:  -- to that effect --

23         MR. KAPLAN:  But I think it's reasonable --

24         THE COURT:  -- but I'm accepting it and it may very

25   well be reasonable.  Is it permissible under the Code.

1        MR. KAPLAN:  I understand, okay.

2        THE COURT:  That's all I'm asking.

3        MR. KAPLAN:  All I'm saying is I believe that it's a

4   standard business practice amongst the mortgage banking

5   industry and servicing industry not to physically move

6   documents from party to party unless there is a change of

7   servicing, in which case the physical files then must be sent

8   to the new servicer, not necessarily the new investor, holder

9   or -- you know, recorded owner of an assignment of mortgage,

10  et cetera, but the new servicer.

11       THE COURT:  Well, it certainly makes sense and

12  presumably the Pooling and Servicing Agreement will clarify

13  that there is agency status for that purpose and we would try

14  to understand whether that would be sufficient for UCC

15  purposes.  What else should I be looking at, counsel?  We're

16  talking first about possession.  What else are we talking

17  about?  All right, let me ask one question before I forget.  I

18  take it that the allonge that we've looked at, the new

19  allonge, has not been recorded?

20       MR. KAPLAN:  Well, normally you would not record a

21  note, Your Honor.  The note passes from party to party.  It's

22  like a check --

23       THE COURT:  Right.

24       MR. KAPLAN:  -- it doesn't get recorded in the

25  County Clerk's Office generally --

1                    THE COURT:  That's fine.

2                    MR. KAPLAN:  -- so it would normally be placed in

3       original -- with all the original documents and essentially

4       attached to the note.

5                    THE COURT:  Understood.  Okay, what else should I be

6       looking at?

7                    MR. LEVITT:  Your Honor, if Your Honor does want to

8       focus on the Pooling and Servicing Agreement, there are other

9       provisions in the Pooling and Servicing Agreement that Your

10      Honor might want to look at, specifically -- and if I could

11      just grab my copy --

12                   THE COURT:  Of course.  Is this your copy?

13                   MR. LEVITT:  Yes, it is.  Actually, I have -- I have

14      excerpts -- copies of excerpts, Your Honor, and I'll --

15      actually I'll hand up the original to you so --

16                   MR. KAPLAN:  I would also argue, Your Honor, in that

17      -- as I said, I believe it's standard operating procedure for

18      servicers, especially when they were the originator of the

19      documents and when they sell them or securitize them and

20      remain the servicer, to execute the documents that are

21      required for transfer, but that there's not a physical

22      transfer.  And if you're going to determine --

23                   THE COURT:  Mr. Kaplan, you're testifying about the

24      ordinary --

25                   MR. KAPLAN:  My witness I think can testify to that

Colloquy                                               32

1   but I think --

2               THE COURT:  Well, you're welcome to have --

3               MR. KAPLAN:  -- I think Your Honor can --

4               THE COURT:  -- her testify.

5               MR. LEVITT:  She has.

6               MR. KAPLAN:  -- I think Your Honor's experience can

7   reasonably allow you to take judicial notice that documents

8   don't go from party to party, that they remain with the

9   servicer.

10              MR. LEVITT:  I don't -- I don't think the --

11              THE COURT:  I'm not going to take judicial notice of

12   that.

13              I noticed that this particular copy is unsigned.  Do

14   you know when the Pooling and Servicing Agreement would have

15   been signed?

16              THE WITNESS:  We went to get a signed copy the other

17   day and we were told that it is not customary for us to have

18   the signed document so I wasn't able to access the signed

19   document.  We have the copy --

20              THE COURT:  But --

21              THE WITNESS:  -- but we don't have the signed

22   original.  I don't have the signed of that.  That's the one

23   document I don't have the original -- access to the original

24   of.

25              MR. LEVITT:  Your Honor, again, I'm not in any way,

Colloquy                                                                  33

1    shape or form testifying but I can advise the Court that I

2    spent many hours trying to find this Pooling and Servicing

3    Agreement on the SEC website where they have to be filed and I

4    could not find it, so the only copy of the Pooling and

5    Servicing Agreement that I have is this unsigned copy provided

6    by counsel for the defendant which I have to accept as a valid

7    document.

8              But I can tell Your Honor, the SEC website is where

9    -- where you can find them; I can't find it.  I can find a lot

10   of others in a similar name but with different numbers.  I

11   can't find this one.

12             THE COURT:  Is there reference in this document that

13   I have in my hand to this particular mortgage?

14             THE WITNESS:  I don't have it in front of me.

15             THE COURT:  There are all kinds of exhibits --

16             THE WITNESS:  It's --

17             THE COURT:  -- that have numbers but don't have

18   substance.

19             (Pause in proceedings)

20             THE COURT:  Have you looked at that, counsel?

21             MR. LEVITT:  Excuse me, Your Honor?

22             THE COURT:  Have you looked at whether there is

23   reference to this particular mortgage?

24             MR. LEVITT:  No, Your Honor.  Your Honor, it wasn't

25   again my experience -- because I've been reading a lot of

Colloquy                                                    34

1    these lately -- my experience is there's a schedule that's

2    annexed.  Very often I'm finding that they don't include the

3    schedule in the filing with SEC I guess for privacy purposes

4    and you're directed to whichever law firm is the firm that

5    filed the documents with the SEC, but I wasn't even provided

6    the schedule as part of this submission.

7          And again, I went onto the SEC website looking for

8    it and couldn't find it.  I will also point out to Your Honor

9    that the copy that I was provided and the copy that's in front

10   of Your Honor on the first page references a draft.  It says

11   "Sidley" -- I guess Sidley and Austin was the law firm, it was

12   their draft dated 06/27/06.  I don't believe, again because

13   this is labeled draft, this may not be the operative document

14   but it is the only document that I was provided by the

15   defendant.

16         MR. KAPLAN:  I understand, Your Honor, and I wasn't

17   involved in transmitting the document but I am aware that it

18   does say that.

19         THE COURT:  Well, I think you need to get involved

20   and --

21         MR. KAPLAN:  I did -- I did ask specifically for a

22   document that was signed and essentially was final.

23         THE COURT:  Essentially?

24         MR. KAPLAN:  Well, it was a final document --

25   signed, final document, not as alleged, a draft.

Colloquy                                        35

1          THE COURT:  And you didn't get it?

2          MR. KAPLAN:  And I have not, no.

3          THE COURT:  So we don't know what this is, nor do we

4     know whether it applies to this particular situation.  The

5     only clue we have is that it's between Countrywide and the

6     Bank of New York trustee and that it relates to Asset-Backed

7     Certificate Series 2006/8 --

8          MR. KAPLAN:  Right.

9          THE COURT:  -- which suggests that it might be the

10    same pool, but we don't know whether it was executed.  We have

11    questions raised because it's not on the SEC website and we

12    don't have a specific listing of this particular mortgage, and

13    I take it that additional time will not help you?

14         MR. KAPLAN:  Well, I don't have physical access.  It

15    would be up to Countrywide or Bank of America --

16         THE COURT:  Well, you as counsel for Countrywide --

17         MR. KAPLAN:  Well, Your Honor, I would certainly

18    request additional time to allow Countrywide, the defendant,

19    to procure the documents, provide them to counsel and Your

20    Honor, as well as for us to synopsize the information

21    contained in there pertaining to possession and retention of

22    documents.

23         THE COURT:  Well, you know, this is a serious

24    consequence -- this meaning the relief sought by the

25    plaintiff.  If there are substantial gaps in my ability to

Colloquy                                                36

1    follow the stream, then the plaintiff will be successful.  I

2    would offer that opportunity to Countrywide.

3            If they can't come up with a signed legitimate

4    verified copy of it -- and it can be in the first instance the

5    final executed document with some tie-in to this mortgage --

6    somebody has an exhibit that would, you know, list this

7    mortgage theoretically -- and if they don't, that's a problem

8    -- with a certification from a qualified Countrywide

9    representative that this is what it purports to be.

10           If there are further questions, we can take further

11   testimony, either in Court or by telephone conference call.  I

12   hate to make you come back from California, although -- and

13   it's not very nice this time of year in New Jersey, I will

14   grant you that, but we can, you know, try to keep going in

15   terms of getting it.

16           There is a limit and there is a burden, I fully

17   agree with you, counsel.  I'm pushing the envelope to see

18   where we get to in terms of lining these things up or not.

19   That's what I'm aiming for because I frankly don't want to

20   grant relief if there is something for instance in these

21   documents and if the final draft has been executed and so

22   forth that should guide resolution of this decision.  It has

23   major implications potentially.  I mean, you know, my written

24   decision may be ignored but it may be a basis for other such

25   relief and I'd like to get it right if I can so --

Colloquy                                37

1          MR. KAPLAN:  I share that thought, Your Honor.  I

2    was going to mention, it does have significant ramifications

3    because of what -- you know, the document and the physical

4    retention of documents or physical transfer of the documents

5    might mean to other -- you know, loans.

6          THE COURT:  Then I urge Countrywide to take it

7    seriously and to direct their attention to -- meaning if there

8    are things that they want under seal for any reason, that's

9    certainly something that we would accommodate in the first

10   instance subject to objection so there is opportunity to work

11   with them on this, but they've got to come to the table, and I

12   think that's demonstrated by this hearing.

13          So if -- if there can be a -- if you're right,

14   counsel, number one that possession is required but if that

15   possession is demonstrated by agency, one might disagree about

16   whether possession can be demonstrated by agency.  Perhaps

17   that's another question that is posed, even if the documents

18   do support that.  But let's assume that Countrywide gets over

19   that hurdle.  What else would we look at -- should be look at?

20          MR. LEVITT:  Again, Your Honor, the lack of

21   endorsement, the fact that there's no allonge affixed so --

22          THE COURT:  Well, affixing of the allonge we've sort

23   of -- we're done with.  We're -- this is not going to be a

24   holder in due course but I'm not sure that it matters.  You're

25   right that there is no affixing, there's no proof that this

Colloquy                                                        38

1     was affixed in the way that the Third Circuit imagined was

2     necessary -- not imagined but proclaimed was necessary.

3            Your assertion would be that the allonge that was

4     executed two weeks ago should not be considered as an

5     appropriate transfer because it was post-petition, it was in

6     the litigation, it wasn't effective as of the date of the

7     proof of claim or better yet, as of the date of the filing of

8     the petition and that therefore, it is invalid.

9            MR. LEVITT:  Correct, Your Honor.

10           THE COURT:  And that is a very legitimate and

11    important issue and I would appreciate Mr. Kaplan dealing with

12    that.

13           MR. LEVITT:  And so getting to the other portion,

14    Your Honor, the only -- and it has nothing to do with holder

15    in due course, we're not raising the fraud issue, we're not

16    raising those issues.  The issue is does this creditor have

17    the right to enforce the note.  So with regard to the allonge,

18    luckily I have a Third Circuit decision that makes it easy.

19    With regard to the other, there's only one other way to

20    enforce and that's to take the rights of the transferee --

21    transferor under the Third Circuit decision and under 3-203.

22           And again there, Your Honor, if my position is the

23    trust has to be in possession of the note and the trust has to

24    prove that it took possession and if we're going to deal with

25    the Pooling and Servicing Agreement -- and, Your Honor, one of

Colloquy                                                     39

1     the reasons why I wasn't moving it into evidence was because

2     to me it wasn't competent evidence at this point, again, it

3     wasn't my burden, but if counsel is going to find the

4     legitimate document that's recorded with the SEC, well that's

5     going to be the Bible, Your Honor, and that's going to say

6     that this note had to be delivered.

7               Whether it ultimately ended up with the trust --

8     with the servicer, the Pooling and Servicing Agreement, if

9     it's at all close to this draft or like every other Pooling

10    and Servicing Agreement I've read, it's going to say it would

11    have had to be physically transferred first from Countrywide

12    was the originator to the depositor, and then from the

13    depositor ultimately to the trust.

14              The physical documents according to the Pooling and

15    Servicing have to be transferred and in this document you're

16    going to see it had to be endorsed.  We're not going to have

17    that here.  So if they can prove that these documents were

18    physically transferred, meaning there's delivery receipts

19    showing they were physically transferred from A to B, from B

20    to C, and if C decided to let its agent hold them, I think,

21    Your Honor --

22              THE COURT:  Well, there's no question on this record

23    and, you know, I'm ready to accept it as fact that these

24    original documents never moved.  I mean, that was the

25    testimony.

Colloquy                                                            40

1          MR. LEVITT:  And if that's the case, Your Honor, I

2     think we're done because unless the documents were physically

3     transferred, the trust ultimately could decide to let its

4     agent -- you know, Countrywide here, despite the witness's

5     beliefs and assertions, Countrywide here is wearing two

6     different hats, it's wearing the hat as Countrywide Home

7     Mortgage, the one that originated these mortgages, packaged

8     them and got rid of them as quickly as they possibly could,

9     that's hat number one, and then as another way to make money,

10    they're a servicer.

11          THE COURT:  Right.

12          MR. LEVITT:  So it's two different -- from all

13    practical purposes and in fact I think the Pooling and

14    Servicing Agreement will show, it's two separate and distinct

15    legal entities, both Countrywide entities, now Bank of America

16    entities.  So if A, which is Countrywide the originator, ended

17    up securitizing and selling this loan they would have had to

18    have followed the terms of the Pooling and Servicing Agreement

19    to get it into the hands of the trust and then D, which is

20    Countrywide the servicer, could have gotten possession.  And

21    even if it meant -- even if they stayed in the same vault but

22    if it meant that there was a delivery receipt from A to D or A

23    to B to C to D, that's what they have to prove.

24          And because they're saying that, now maybe they do

25    have those delivery receipts and if they want to produce them,

Colloquy                                                41

1    that's great, but if that document never moved from that safe,

2    first of all they're in violation of their Pooling and

3    Servicing Agreement, they're in violation of the UCC -- we're

4    done.

5             THE COURT:  If they're in violation of the UCC, I'm

6    agreeing with you.  If they're in violation of the Pooling and

7    Servicing Agreement, I wonder how a debtor can avail

8    themselves of enforcement of the pooling and servicing --

9             MR. LEVITT:  Third-party beneficiary.

10            THE COURT:  I'm sorry?

11            MR. LEVITT:  They're the third-party beneficiary of

12   this contract.

13            THE COURT:  Beneficiary in terms of where the

14   documents are -- that's a tough one.

15            MR. LEVITT:  In terms of -- and sometimes it's

16   third-party detriment too because we have all these problems

17   of the way these servicers act, but the reality is, Your

18   Honor --

19            THE COURT:  It's a whole other story.

20            MR. LEVITT:  -- we're referenced, again, they're

21   going to produce the document, we're going to be referenced as

22   one of the loans that are subject to this Pooling and

23   Servicing Agreement.

24            THE COURT:  Yes, but the moving around of the

25   documents are not for the benefit of the third-party

Colloquy                                                    42

1    beneficiary.  You can make the argument that they are because

2    they act upon the UCC protections of knowing who's holding

3    what.  That's not an unreasonable argument and I'm thinking it

4    out as we go, but here's what I need, counsel.  Because your

5    submission didn't focus, I would -- because you didn't have

6    the --

7            MR. LEVITT:  I --

8            THE COURT:  -- the factual basis --

9            MR. LEVITT:  Correct.

10           THE COURT:  -- now you do, I would appreciate your

11   honing in on your arguments.  They are to -- we've eliminated

12   the affixing as we've said, but I'm interested in the

13   possession element.  At the same time that I allow the

14   defendant to amplify upon their argument by future submission,

15   not only of a document that is a final version if you have it

16   and can get it and can certify that that's what it is and a

17   focus on what provisions in that document I should -- on both

18   sides pay attention to -- obviously, when you get it you

19   provide it to counsel as well, in addition to any argument

20   that you would focus me on.

21           So it's half-baked.  We've made some progress.

22   We've understood certain factual predicates that the documents

23   remained where they were, that the allonge was created two

24   weeks ago and those are important facts to fit into the

25   equation.

DeMartini - By the Court                                        43

1            Did you have a comment, sir?

2                  MR. KAPLAN:  Yeah, I'm just -- I'm just a little --

3       and believe me, I understand where Your Honor is heading.  I'm

4       not -- I know I'm not going to change Your Honor's mind, but

5       I'm a little troubled by the fact that we're accepting a

6       representation here.  And this witness is in the Litigation

7       Department, this witness is not the person that was

8       responsible for the Pooling and Servicing Agreement or how

9       these documents are dealt with.

10            I think at the very least, even if we don't have

11      live testimony, we need to have something from someone who can

12      say they're custodian of records that truly tracks this.

13      We're accepting a representation --

14                  THE COURT:  Which representation?

15                  MR. KAPLAN:  The representation that they stayed in

16      the same vault and they never moved.  We don't know that, Your

17      Honor.  We're -- this is --

18                  THE COURT:  But let's examine --

19                  MR. KAPLAN:  -- and a lot of that is counsel's

20      representation.

21                  THE COURT:  -- Ms. DeMartini in terms of her

22      knowledge of that fact.

23                            EXAMINATION

24      BY THE COURT:

25      Q    You've testified that these documents, the originals, the

DeMartini - By the Court                    44

1    files --

2    A    Have remained with Countrywide.

3    Q    -- stayed with -- now, are there two different entities?

4    This note was entered into with Countrywide Home Loans, Inc.

5    A    Yes.

6    Q    Is that the same as Countrywide Home Loan Servicing, LP?

7    A    Countrywide Home Loan Servicing, LP is the -- is our

8    service -- is the portion of the business that does the

9    servicing of the loan so they are slightly different in that

10   they were both part of the -- what was formerly Countrywide

11   Financial Corporation.  Countrywide Servicing Home Loans, LP

12   was the servicing portion of that business.  They would -- and

13   Countrywide Home Loans would have been the ones that

14   originated the loan.

15   Q    Well, let's talk first about your experience with the

16   company.  You said that you started about ten years ago?

17   A    Yes.

18   Q    And with which company, the servicer or the --

19   A    I've always been involved with servicing.

20   Q    In the servicing.

21   A    Yes.

22   Q    And what were your positions with servicing?

23   A    Oh, I've had a lot of positions with servicing.  I've been

24   a customer service representative, I've been a supervisor,

25   I've been a trainer, I've been a training developer, I've

DeMartini - By the Court                                    45

1     managed our Policies and Procedures writers, I've been a

2     Communications leader, I've been a senior team leader, I've

3     been a team leader auditor, a team leader trainer -- I've done

4     all kinds of things all within the customer contact area of

5     servicing.

6            And as being part of customer contact we had to --

7     we were involved in every aspect of the servicing.  We were

8     the ones that did all of the speaking to the borrowers about

9     anything to do with their loans so I had to know about

10    everything in order to be able to do that and in order to be

11    able to train the customer service representatives.

12           In order to do that, as I stated before, I went over

13    to the -- we were called the Case Management Department; now

14    we're called the Litigation Management Department.  We are

15    part of servicing as well under -- under -- in the loan admin

16    servicing, what used to be loan admin servicing as a

17    supervisor last September.

18    Q    What contact, if any, during your experience with

19    Countrywide Servicing have you had with the loan originator

20    aspect of the company?

21    A    I've never been involved specifically with the

22    originations of the -- of the loans.  As a servicer, we get

23    involved after the loan is established and we're the ones that

24    then deal with everything after the fact.

25    Q    What do you -- are you aware of the procedures that occur

DeMartini - By the Court                                    46

1    internally as between the originator and the servicer as soon

2    as the loan is given?

3    A    Well, after the loan's originated, then it's going to what

4    we would have called boarded our system.  I would be familiar

5    with it from the time that it boarded on --

6    Q    What does that mean?

7    A    Boarded is when it would get put into the computer system.

8    That would be when the documents are all imaged and then

9    stored.  That all happens when the loan comes on board or

10   becomes a part of our servicing.  What happens to it prior to

11   that as far as the origination process inasmuch as the

12   underwriting or any of that, that I'm not as familiar with,

13   no.

14   Q    When the file is -- when the loan is boarded, who does

15   that?

16   A    Let me find the best way to describe that.  Well, the

17   documents themselves, we have a Documents Department that

18   would be in charge of imaging and then they would be the ones

19   that would be storing the original documents.  We have a

20   system --

21   Q    Is that within your servicing company?

22   A    That would be under our servicing company, yes.

23   Q    Have you ever dealt in that department -- the Documents

24   Department?

25   A    I have not physically worked in that department.  I've

DeMartini - By the Court                                    47

1    been in that building, I -- but for me to specifically be the

2    one doing that, no, I haven't.

3    Q    Have you had occasion to go there to look for a document

4    let's say or --

5    A    I've had occasion to speak to people -- the documents --

6    some of them are stored -- they're stored there and then we

7    also have other storage facilities.  These particular

8    documents are in our building because I looked these ones up,

9    but --

10   Q    What do you mean, you've looked these up -- these ones up?

11   A    Well, when we went to order the originations file we

12   looked -- looked for the -- the documents.  The documents had

13   been previously requested by our Foreclosure Department and so

14   that's where they're located right now.  The physical

15   documents are in the Foreclosure Department.

16   Q    The original physical documents?

17   A    Yeah.

18   Q    So is it your custom to request original documents --

19   A    The --

20   Q    -- from this department when the Litigation Department

21   needs them?

22   A    If they're requested by counsel, if they're requested for

23   various things with whether it's within a foreclosure or a

24   bankruptcy.  But if there's something that comes up where

25   we're being asked to prove something, then it's becoming more

DeMartini - By the Court                                    48

1   customary lately.

2            It never used to be to where the originals were ever

3   requested but lately more and more of the time of day of

4   things around the country, we are being asked to physically

5   produce the originals more frequently.

6   Q    And you would direct those inquiries to the Document

7   Department?

8   A    Yes, Document Request.  It's our DMS system, it's our

9   Document Request.

10  Q    And so to your knowledge, the original documents, the

11  origination documents, the notes and the mortgages are

12  maintained in that facility?

13  A    Yes.

14  Q    To your knowledge, are they ever moved except for

15  inquiries from counsel?  Are they ever moved to follow the

16  transfer of ownership?

17  A    I can't say that they're never moved because, I mean, with

18  this many millions of loans as we have I wouldn't presume to

19  say that, but it is not customary for them to move.

20  Q    Do you have personal knowledge of under what circumstances

21  they would move or whether and to what extent they're ever

22  moved?

23  A    Not -- not specifically to what I would be comfortable

24  testifying to, no.

25  Q    Okay.  In terms of this particular transaction, from your

DeMartini - By the Court                                          49

1    experience of requesting these original documents, were you

2    able to establish that these were not moved?

3    A    We were able to establish that they're in our -- what we

4    call the 400 Building which is the building that we're --

5    where we're at and we were able to establish that that's where

6    they're located and that's -- we were still in the process of

7    trying to physically get them to bring them here today but it

8    just -- I wasn't able to obtain them in time.

9    Q    And your information is that they may be at the

10   Foreclosure Department, but are you certain that they weren't

11   moved out of the servicing company?

12   A    We had Federal Express tracking.  Even when we move

13   something internally like that a lot of times it will go Fed

14   Ex so that we have that tracking so that's how I know that

15   they went there because I have the tracking number --

16   Q    I see.

17   A    -- so that's how I know that they're there, and I don't

18   have any receipt or any tracking that they've ever moved

19   beyond that.

20   Q    Understood.

21           THE COURT:  Did I generate additional questions?

22           MR. KAPLAN:  No, Your Honor.

23           MR. LEVITT:  No, Your Honor.

24           THE COURT:  All right.  Are there any other

25   questions for Ms. DeMartini?

1              MR. LEVITT:  No, Your Honor.

2              THE COURT:  Thank you, Ms. DeMartini.  You may step

3    down.

4              (Witness excused)

5

6                              *  *  *

7

8


                      C E R T I F I C A T I O N


              I, Diane Gallagher, court approved transcriber,

certify that the foregoing is a correct transcript from the

official electronic sound recording of the proceedings in the

above-entitled matter.



     /s/Diane Gallagher        November 22, 2010

DIANE GALLAGHER

DIANA DOMAN TRANSCRIBING